**Ben SAPIR, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

No. 4912.

United States Court of Appeals
Tenth Circuit.

Oct. 20, 1954.

As Modified Nov. 17, 1954.

Rehearing Denied Dec. 13, 1954.

John B. Tittmann and T. B. Keleher, Albuquerque, N. M. (A. H. McLeod, Albuquerque, N. M., on the brief), for appellant.

Melvin L. Robins, Asst. U. S. Atty., Albuquerque, N. M. (Paul F. Larrazolo, U. S. Atty., Albuquerque, N. M., on the brief), for the United States.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

Sapir and one Canfield were charged by indictment with a conspiracy to defraud the United States in violation of 18 U.S.C.A. § 371. From a judgment and sentence on a verdict of guilty, Sapir has appealed.

The New Mexico Institute of Mining and Technology, located at Socorro, New Mexico, hereinafter referred to as the Institute, pursuant to a contract with the United States Navy, was engaged in a research project involving airplane components and missiles. For reasons of military security the contract was "classified." Under the contract, the Institute was possessed of certain property of the United States used in connection with such research program. It was determined that certain aluminum and brass surplus should be sold as scrap. These materials were used in classified experimental work. The aluminum bore marks from which it could be readily recognized as property of the United States. The aluminum was smelted into ingots in order to destroy its identity and in order to make it unrecognizable as property of the United States and to maintain the secrecy of the classified experimental work. Canfield, who was purchasing agent for the Institute, in May, 1953, issued an invitation to bid on the following items: "Aluminum, resmelted, in ingot form" and "Brass, oil radiators, removed from aircraft." The bid form was on the

letterhead of the Institute and was the standard form used by the Institute in its ordinary transactions and carried the notation "for sale by the N. M. Institute Mining & Technology, Socorro, N. M." The procedure used in the sale of the scrap was the normal procedure for the sale of property of the Institute. Sapir was the successful bidder. After he had signed the bid and returned it to the Institute, it was approved on May 19, 1953, by Commander J. F. Gill, Development Contract Officer and the Navy representative in charge of the program at the Institute. It was accepted by Canfield, the purchasing agent, on May 25, 1953. Both endorsements were placed on the bid after Sapir had returned it and he had no knowledge that it was approved by anyone other than the Institute. The notice of award of bid, which was sent to Sapir on May 25, 1953, was the regular Institute form and contained nothing to indicate that the United States was in any way involved in the transaction.

On June 12, 1953, Sapir removed 96,580 pounds of aluminum ingots and 2,998 pounds of brass from the property of the Institute by truck and loaded it into a railroad car. The Institute having no facilities for weighing the aluminum and brass surplus, it was agreed that the items would be paid for on the basis of railroad weights. Pursuant to an agreement between Canfield and Sapir, one truckload was not loaded into the railroad car, but was transported directly by truck from its location on the Institute property to a warehouse in Albuquerque. The following day, Sapir gave Canfield $200. The Institute invoiced Sapir only for the 96,580 pounds of aluminum ingots and 2,998 pounds of brass, which were loaded into the railroad car. Canfield knew that the aluminum ingots and brass belonged to the United States.

An essential element of the offense charged was an intent to defraud the United States.[1] Sapir could not have intended to defraud the United States, unless he knew the property which he purchased belonged to the United States.

The sole question presented on this appeal is whether Sapir knew or had reason to believe that the property which he purchased belonged to the United States, and, therefore, could have intended to defraud the United States through his arrangement with Canfield to transport one truckload of the aluminum and brass directly to Albuquerque and thus avoid it being weighed and invoiced to him. It is manifest from the record that the Institute, at the direction of the representatives of the United States, went to great lengths to conceal the ownership of the property which was the subject matter of the sale. The United States relies upon certain circumstances to establish that Sapir knew the property which he purchased belonged to the United States.

Sapir had a prior purchase transaction with the Institute and he went to one Sweet and requested a refund of part of the purchase price paid. Sweet told Sapir any refund would have to be taken up with Commander Gill or Doctor Workman. Workman was the administrative head of the Institute. Sweet testified that after his conversation with Sapir, "We talked it over with Doctor Workman and Commander Gill and they agreed they would not hold him * * *." But, it is clear from the record that Sapir was not present when the matter was taken up with Commander Gill. Commander Gill testified that he first met Sapir on the day before the trial on the conspiracy charge and there is no evidence in the record that Sapir knew or had reason to believe that Commander Gill was in anywise connected with the sale of the property out of which the conspiracy charges grew.

The materials which were the subject matter of the sale were not materials ordinarily handled by the Institute. However, it is apparent that the Institute made two sales of such materials and in

1.  Salas v. United States, 2 Cir., 234 F. 842, 845; United States v. Jenks, D.C.Pa., 258 F. 763, 765.

724

both transactions handled the property as if it were its own.

Of course, the research program and the sale of the materials were not normal activities of the Institute. But, it was a school of mines, and research, with respect to metals and metal products and the accumulation of metal scrap, was not so foreign to its normal functions as to lead a reasonable person to believe, under the circumstances surrounding the sale, that the materials did not belong to the Institute.

On the day that Sapir loaded the materials, an official United States Navy truck with the markings "U.S.N. 94–16278" was parked nearby. But, there was no evidence that Sapir had any knowledge that the truck was in anywise used in connection with the property sold.

The Institute had no facilities for weighing the materials and from that circumstance it is sought to draw the inference that the sale of the property to Sapir was not a normal activity of the Institute.

On July 29, 1953, an FBI agent talked with Sapir. Sapir asked the agent, "What is your interest in the case?" The agent replied that property of the United States was involved in the investigation. Sapir then stated, "I remember the deal. It is a closed case, is it not?" However, that conversation occurred long after the alleged conspiracy had been consummated.

■ It is well settled that an inference cannot be predicated upon another inference. Presumption cannot be superimposed upon presumption to reach a factual conclusion.[2]

■ In order to warrant a judgment of conviction on circumstantial evidence, the facts and circumstances shown must be consistent with each other and with defendant's guilt and inconsistent with any reasonable theory of innocence.[3]

■ We are of the opinion that the proven circumstances, either separately or in their totality, were insufficient to warrant the jury in finding beyond a reasonable doubt that Sapir knew or had reason to believe that the property which was the subject matter of the sale belonged to the United States. Accordingly, we conclude that the evidence did not establish an essential element of the offense charged and that the trial court erred in not sustaining the motion of Sapir for a directed verdict of not guilty and should have sustained the motion of Sapir for a judgment of acquittal notwithstanding the verdict.

The judgment is reversed and the cause remanded for a new trial.

---

2. Rosenberg v. United States, 10 Cir., 120 F.2d 935, 937.

3. Morgan v. United States, 10 Cir., 159 F.2d 85, 87.