**UNITED STATES of America,
Appellee,**

v.

**Nicholas TUTINO, Defendant-Appellant.**

**No. 345, Docket 25494.**

United States Court of Appeals
Second Circuit.

Argued June 11, 1959.

Decided July 21, 1959.

Daniel H. Greenberg, New York City, for defendant-appellant.

John C. Lankenau, Asst. U. S. Atty., Southern District of New York, N. Y., New York City (S. Hazard Gillespie, Jr., U. S. Atty., for the Southern District of New York, N. Y., and Kevin Thomas Duffy, Asst. U. S. Atty., New York City, on the brief), for appellee, United States of America.

Before HINCKS and MOORE, Circuit Judges, and SMITH, District Judge.

J. JOSEPH SMITH, District Judge.

Appellant Nicholas Tutino and one Richman were convicted on trial to Judge Kaufman, without a jury, in the United States District Court for the Southern District of New York of conspiracy il-

legally to sell narcotics. A third defendant, one Papalardo, was acquitted. Richman was sentenced to imprisonment for two and one half years. He has not appealed. Tutino was sentenced to imprisonment for four years. He has appealed *in forma pauperis.* We find that Judge Kaufman had before him substantial evidence of each of the elements of the crime charged and affirm the judgment.

October 27, 1953, Chappell, a federal narcotics agent, sought out defendant Richman in Cleveland, Ohio, and made an appointment to meet him at the El Bolero Bar. Pursuant to the appointment, they met, Chappell representing himself to be Jimmy White, a close friend of one Smitty, with whom Richman had had negotiations about a "deal" which had fallen through. Chappell represented that he wanted to help Smitty by sharing the profits from a transaction. After receiving from Chappell as references the names of underworld characters in Buffalo, Richman, who needed money, agreed to contact people in Buffalo who would furnish heroin to Chappell for $13,000 a kilo. Chappell asked that the amount be half a kilo at the same rate, as $13,000 would exhaust his capital. Richman was dubious about the smaller amount, but promised to try. Richman the next night, after some telephoning, gave Chappell his business card and a telephone number in Niagara Falls at which he was to ask for Pat or Nick. It was agreed that Chappell would go to Buffalo October 30. Richman requested that his share of profits from each transaction be given to Richman's brother. On October 30, Chappell went to Buffalo, called the given number, asked for Pat or Nick, and talked with defendant Tutino, who was the "Nick" referred to. Chappell and Tutino met and Tutino agreed to furnish pure heroin at $13,000 a kilo, to be delivered November 2nd in New York City, Chappell to go to the Commodore Hotel and to have an inspection of the drugs before payment. On November 2, Chappell and Tutino met at the Commodore. Tutino demanded payment of the $13,000 in advance. Chappell refused to pay the $13,000 in advance of delivery but tendered $2,000 in bills for four or five ounces, payment in advance. Tutino refused the money on the stated ground that there was as much risk on a sale of four or five ounces as on a sale of a kilo and the profit on a $2,000 deal wasn't enough to make it worth while. They parted with no further agreement. Some twenty minutes later Chappell encountered Tutino outside the hotel, when Tutino suggested defendant Papalardo in Cleveland as a reference, in an effort to obtain Chappell's agreement to advance payment. Chappell agreed to accept Papalardo's recommendation. Tutino left, went to the Warrington Hotel bar with two men, and had a conversation there. Tutino went alone to the Statler, gave a ticket to a bellboy and received a small valise which he took to the Warrington bar and met with one of the men he had talked with there earlier. Tutino phoned Chappell and gave him a number in Cleveland—the Victory Lounge—at which Papalardo could be reached. Chappell phoned Papalardo and made an appointment for a meeting in person at the Victory Lounge at which Papalardo vouched for Tutino as "good people" to deal with for "junk," on being informed that payment in advance was being required. Chappell then called Tutino in Niagara Falls and requested half a kilo. Tutino called back and told Chappell he had talked with the people in New York and they had agreed on the half kilo transaction but that future transactions would have to be for a whole kilo. He told Chappell that on the night Chappell had refused to take the stuff and refused to put the money out, Tutino already had the stuff and had to return it, and that his people didn't like it. Chappell went to New York to the Commodore November 5, received a call from Tutino, and following another call November 6 met Tutino in the Commodore lobby and accompanied him to Thompson's restaurant nearby. Arrangements were made for Tutino to call Chappell when delivery was ready and for Chappell to take a taxi to meet Tutino. They went from Thompson's

into Grand Central Station, where the money ($6,500) was passed by Chappell to Tutino. Tutino then in cabs and on foot, doubling back and making many changes of direction, shook off surveilling agents and disappeared with the money. No call was made to Chappell. No narcotics were delivered. Richman and Papalardo, advised of Tutino's disappearance, endeavored to locate him without success. Tutino was reported to be in Florida, and was finally located on November 23, 1953 in the Rochester County Jail, where he denied ever seeing Chappell before.

■ Tutino attacks the sufficiency of the evidence to sustain the finding that his guilt was proved beyond a reasonable doubt. The test is whether, taking the evidence in the view most favorable to the government, there is substantial evidence to support the verdict. United States v. Manton, 2 Cir., 107 F.2d 834, 839. This circuit has never held that circumstantial evidence, to be sufficient to convict, must exclude every reasonable hypothesis of innocence to be drawn from the evidence. The rule referred to in Sapir v. United States, 10 Cir., 1954, 216 F.2d 722, 724, citing Morgan v. United States, 10 Cir., 1947, 159 F.2d 85, 87, has not been followed here. The Supreme Court in the Holland case has resolved the apparent conflict, approving the formulation of the rule in this circuit. Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; United States v. Moia, 2 Cir., 1958, 251 F.2d 255; United States v. Austin-Bagley Corp., 2 Cir., 1929, 31 F.2d 229; United States v. Becker, 2 Cir., 1933, 62 F.2d 1007, 1010.

We turn to Tutino's claims as to the evidence before Judge Kaufman.

■ Tutino's first claim is that since Papalardo was acquitted, and proof is necessary that Richman and Tutino engaged in the requisite criminal agreement or conspiracy, the prosecution must fail for lack of proof of Richman's participation. It is contended that Richman's connection was merely that of giving Chappell an introduction to Tutino and under the doctrine of United States v. Moses, 3 Cir., 1955, 220 F.2d 166, this is insufficient to make Richman an aider or abettor of Tutino or a co-conspirator. The facts here, however, sufficiently distinguish Richman's role from that of Marie Moses. Richman not only performed an introduction but went to some pains and expense for long distance calls to get the scheme rolling and to try to complete it by locating Tutino after his disappearance. Moreover, while a monetary "stake" in the outcome is not in all cases necessary, United States, v. McKnight, 2 Cir., 1958, 253 F.2d 817, 819, United States v. Tramaglino, 2 Cir., 1952, 197 F.2d 928, certiorari denied 1952, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670, Richman had such an expectation of profit here, requesting that his cut be paid over to his brother. There is substantial evidence here of Richman's knowing participation in a scheme to sell illegally narcotics to Chappell.

■ The second contention on Tutino's behalf is that the evidence is as consistent with a scheme to defraud Chappell of the $6,500 as it is with a scheme actually to furnish illegally narcotics. There was, however, substantial evidence in favor of the existence of the narcotics scheme in the insisting on underworld references for Chappell, in the rejection of the $2,000 cash offered for the smaller amount, and in Tutino's statements as to the nature of the traffic and his own part in it. The finding that the scheme was genuine and proceeding to function up to the point where Tutino was being followed and took flight is supportable. On Tutino's own statement to Chappell after the incident of the $2,000, that he then had the heroin, corroborated in some slight degree by the agent's observation of his possession and transportation of the valise at that time, a conclusion is justified that the scheme had progressed to the point of availability of the goods for delivery, so that the object of the conspiracy was possible of accomplishment. Tutino would have it said that his statement to Chappell cannot be taken as true because it is possible that he was lying in order to accomplish.

a different crime. This would open up interesting possibilities. Here the judge, however, was not faced with the statement alone, but was able to weigh it in conjunction with Tutino's actions when confronted with the opportunity to abscond with $2,000 cash if a money swindle alone was his object—and this at a time when there was no present plan for continuing with the larger swindle he would have us believe was his sole object. Judge Kaufman's conclusion that the narcotics deal rather than a pure money swindle was the joint purpose of Richman and Tutino must be upheld as founded on substantial evidence.

 Judge Kaufman adverts to Richman's actions in endeavoring to locate Tutino after Tutino had absconded with the $6,500 as an admission that no swindle was intended. Richman's admissions after termination of the conspiracy, although properly considered as to Richman, would not be binding upon or admissible against Tutino. Judge Kaufman refers also, however, to Tutino's own conduct under surveillance and to the $2,000 incident involving Tutino. We will not presume that the judge made improper use of the evidence as to Richman's admissions. Weinberg v. Northern Pac. Ry. Co., 8 Cir., 1945, 150 F.2d 645. Without them there is substantial evidence against Tutino, and that is the test we must apply. "We must take that view of the evidence most favorable to the government and sustain the verdict * * * if there be substantial evidence to support it." United States v. Manton, supra [107 F.2d 839]; United States v. Goldstein, 2 Cir., 1943, 135 F.2d 359. This is so whether the trier be jury or judge. United States v. Dudley, 2 Cir., 1958, 260 F.2d 439.

 Final success of the illegal agreement is, of course, not necessary in order to complete the crime of conspiracy, so long as the agreement is shown, and some overt act toward its accomplishment is proved. Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, certiorari denied 1957, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597.

The judgment is affirmed.

The Court desires to express its appreciation to Daniel H. Greenberg, Esq. of the New York Bar, for his able presentation as assigned counsel of Tutino's appeal.