**UNITED STATES of America,**
**Appellee,**

v.

**Edwin MURRAY, Appellant.**

**No. 37, Docket 26741.**

United States Court of Appeals
Second Circuit.

Argued Sept. 27, 1961.

Decided Jan. 10, 1962.

Certiorari Denied March 26, 1962.
See 82 S.Ct. 845.

Louis Bender, New York City, for appellant.

Edward Brodsky, Asst. U. S. Atty., Southern Dist. of New York, New York City (Robert M. Morgenthau, U. S. Atty., and Arthur I. Rosett, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

LUMBARD, Chief Judge.

Edwin Murray appeals from his conviction on two counts of income tax evasion for the years 1952 and 1953 in violation of § 145(b) of the Internal Revenue Code of 1939.[1] He was charged with reporting net income of only $6,504.45 and $4,038.09 for 1952 and 1953 respectively, whereas his net income for those two years calculated from increases in his net worth was allegedly $24,017.60 and $19,838.82, respectively. The government claimed that the difference in net income came from gambling activities; the defense was that the apparent increases in net worth came from a loan of $32,000 by one John Lamb. Murray was sentenced to imprisonment for one year and one day on each count, the sentences to run concurrently, and was fined a total of $5,000.

Murray's appeal alleges that the government's evidence was insufficient to take the question of his guilt to the jury, that there were errors in the admission and exclusion of evidence, and that the trial judge erred in permitting the government to contradict its bill of particulars in summation. He also claims error in the denial of his pretrial demand for inspection of the transcripts of statements given by him to the Intelligence Division of the Internal Revenue Service. We affirm the conviction.

I. *The Sufficiency of the Evidence*

■ Murray attacks Judge Dawson's denial of his motion for acquittal at the close of all the evidence, claiming that the government did not adduce sufficient proof to permit the jury to find beyond a reasonable doubt that the essential element in the alleged increase in net worth —the purchase and remodeling of a house in New Rochelle, New York, for a total of approximately $32,000—was not explained by the loan claimed to have been made by John Lamb. Murray does not attack the government's marshalling of evidence in other respects, and we see no reason to raise any other question as to its sufficiency.

The evidence supports the inference that Murray's gambling operations in 1952 and 1953 were "capable of producing much more income than was reported and in a quantity sufficient to account for the net worth increases." Holland v. United States, 348 U.S. 121, 138, 75 S. Ct. 127, 137, 99 L.Ed. 150 (1954). And no attack is made upon the proposition that if the $32,000 expenditure was made out of income during the two tax years under consideration the statute was violated. Thus the question before us is whether the government satisfied its burden of producing sufficient evidence for the jury to find beyond a reasonable doubt, as Judge Dawson properly charged, "that the expenditure was not financed by a loan from John Lamb." We hold that on this question "taking the evidence in the view most favorable to the government, there is substantial evidence to support the verdict." United States v. Tutino, 269 F.2d 488, 490, (2 Cir. 1959).

The government's disproof of Murray's claim that the New Rochelle house was purchased and remodeled with funds lent him by John Lamb consisted largely of testimony tending to show that at the time of Lamb's death in 1955 and prior thereto he was in such financial straits that it was highly unlikely that during the period in question he had the resources to lend anyone $32,000. Murray, in his last statement to the Internal Revenue Service, had said that he had paid off his debt to Lamb in 1954 or 1955; the

[1]. Section 145(b), Internal Revenue Code of 1939.

"Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

government's evidence as to Lamb's financial condition also supported an inference that during those years Lamb had not received such repayment.

The government adduced testimony that John Lamb, who was a member of Father Divine's Mission in Harlem, lived in a Mission residence for a number of months prior to his death. Sunshine Bright, a housekeeper for the Mission, testified that on a number of occasions Lamb's checks in payment of his rent of four dollars a week were returned because of insufficient funds; she further testified that Lamb had been dispossessed from his real estate office for nonpayment of rent. A friend of Lamb's, Rev. William Aaron, testified that between 1953 and 1955 he had on several occasions lent Lamb small amounts of money which had never been repaid, and that during the same period, while Lamb was living in Lamb's office, he had without payment provided Lamb with food and a blanket. In addition, there was evidence that on his entry into Harlem Hospital in 1955 Lamb had said that he had no income and no bank account. The only significant evidence that Lamb had any money was the statement of an Internal Revenue agent that Lamb's account at the Manufacturers Trust Company contained an average balance of five or six hundred dollars, but this falls far short of any likelihood that Lamb ever had $32,000 to lend to Murray. Cf. United States v. Sclafani, 265 F.2d 408, 411–412 (2 Cir.), cert. denied 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959); United States v. Adonis, 221 F.2d 717, 720 (3 Cir.1955).

Murray did not take the stand at the trial, but the government read into evidence excerpts from several pretrial statements which he made to the Internal Revenue agents who investigated his case. His conflicting versions of the source of the money used to buy and repair the house further strengthen the government's case. On June 30, 1956 he stated that the transactions had been financed with accumulated savings; on January 3, 1957 he said that his savings had been supplemented with a loan of $12,000 from gambling friends whom he would not identify; on April 23, 1958 he said that $13,000 to $15,000 had come from Lamb; finally on May 28, 1958 he claimed—as did his counsel at trial— that the entire expenditure of $32,000 was financed by a loan of that amount from Lamb. There was no documentary evidence of such a loan.

Murray supported his defense with the testimony of the broker handling the sale of the house that at the closing Lamb had been present and had $20,000 to $22,000 in cash with him which he turned over to the seller; the broker also testified, without objection from the government, that later he had heard that Murray had borrowed the money from Lamb. Seymour Waterman, in whose name title to the house was taken and who was president of the holding company (wholly owned by Murray) to which it was subsequently transferred, also testified, again without objection, that Murray had told him that he was going to borrow money from Lamb to finance the house. This, together with the testimony of Mabel Hope to be considered below, constituted Murray's defense. We hold that there was ample basis for the jury's rejection of the defendant's explanation.

## II. Objections to the Admissibility of Evidence

A. Testimony of Mabel Hope—To bolster its contention that the New Rochelle house had been financed by John Lamb, the defense called a Mrs. Mabel Hope, who testified that she had "followed" the Father Divine Mission, knew "Brother" Lamb well, and shortly after 1940 had borrowed $2,000 from him without any documents, to buy a house. She further stated that Lamb had told her "that Murray was a very nice fellow and he felt if [sic] he was his own son, and * * * he would help him in something. He said he would help him to do some kind of business. That is as much as he told me." This, together with Mrs. Hope's opinion that Lamb was "a wealthy man," does not, as we have indicated, detract materially from the sub-

stantiality of the evidence supporting the verdict, especially in the light of the fact that Mrs. Hope did not state when it was that Lamb professed his disposition to aid Murray.

■ More specific attack is made upon the refusal of Judge Dawson to allow Mrs. Hope to answer defense counsel's question, "Did he indicate that he ever lent Ed Murray money?" We agree with Judge Dawson that any answer to this question would have been inadmissible hearsay. Obviously appellant's contention that this testimony should have been allowed because certain of the government's evidence was allegedly hearsay as well is unpersuasive. Nor do we see any force in the argument that Mrs. Hope's testimony should have been admitted under the hearsay exception relating to statements reflecting the state of mind of the declarant, United States v. Annunziato, 293 F.2d 373, 378 (2 Cir. 1961), cert. den. 82 S.Ct. 240; 6 Wigmore, Evidence §§ 1725–31 (3d Ed. 1959). Clearly a statement by Lamb that he had on prior occasions lent money to the defendant, or even a statement that on this occasion he had lent him the $32,-000 in question (the time reference of the question to Mrs. Hope being unclear) would tend primarily to show not Lamb's intention or state of mind toward Murray as he spoke but whether or not a loan had actually been made. Thus the out-of-court statement was offered for the forbidden purpose of proving the truth of its contents, and does not come within this or any other exception to the hearsay rule. Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933); McCormick, Evidence, § 271 (1954).

■ B. *Testimony of Lillian Smith* —Lillian Smith, who was called by the government, testified on a variety of matters. She was secretary-treasurer of the holding company which held nominal title in the New Rochelle house, but her testimony about the payment at the closing of the sale (at which she was present) was totally inconclusive. She fur-

ther testified that, "a few months before" the purchase of the house she had seen Murray with two shopping bags full of money, and that he had gotten the money "from gambling. He hit a number." On cross-examination, however, she wavered as to the time when she had seen the money, admitting that it might have been as much as four years before the purchase of the house, and further said that she had no knowledge of the source of the money used to pay for the house or whether Murray had engaged in gambling since "years and years ago." On redirect, Miss Smith testified that she had once done housework for Murray, but denied any other employment connection with him. At that point, over the defense's objections, the government attorney confronted her with a prior statement signed by her to the effect that at one time she had been a numbers runner for Murray; in the statement dates were not established, but Miss Smith did say that she had not been a runner between 1953 and 1956. The judge permitted the use of the statement on the ground of surprise; Miss Smith denied its accuracy.

The appellant attacks the government's use of Miss Smith's prior inconsistent statement to impeach its own witness. We find no error. We agree with the trial judge that it was proper for the government to make use of a prior inconsistent statement of its own witness when she reversed herself on the question whether she had ever worked for Murray as a numbers runner. The implication of the prior statement that she had been a runner, but not in the years 1953 through 1956, might well be that she had been a runner in 1952, the first tax year in question, and thus that at that time Murray had been in the policy business. It was obviously material whether or not Murray was at that time in the policy business, and the government's case was harmed by Miss Smith's surprising answer.

The fact that the statement was used to cast doubt upon Miss Smith's negative testimony, and thus to build the govern-

ment's case rather than merely to tear down testimony actually harmful to it does not make it any less admissible. We passed upon a similar situation in Di-Carlo v. United States, 6 F.2d 364 (2 Cir.), cert. denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925). In that case, in admitting a prior inconsistent statement when a witness testified that she had been unable to identify her assailants as the defendants, we said:

"The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge * * * The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the 'stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court." Id., 6 F.2d at 368.

See United States v. Allied Stevedoring Corp., 241 F.2d 925 (2 Cir.), cert. denied 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957).

This is not, like United States v. Block, 88 F.2d 618 (2 Cir.), cert. denied 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347 (1937), a case of an attempt to introduce an entire series of extrajudicial questions and answers when a witness refuses entirely to testify about matters on which he has previously been voluble. Rather, here the presentation was giving the jury an opportunity to determine the truth of Miss Smith's negative response to a single question by noting her prior inconsistent answer and observing her attempt to reconcile her pre-vious statement with what she now claimed to be the truth. Thus the jury was to draw its conclusion not from the out-of-court statement, but rather from the witness' in-court conduct when confronted with it. So considered, the statement was not hearsay.

Murray also claims that it was error for the trial judge to permit the government to begin its examination of Miss Smith by asking her about her criminal record. She testified that she had been convicted for policy dealings in 1942, 1943, 1956 and 1959, and that in 1939 she had been convicted of violating the election law. Murray's counsel objected to the relevancy of the testimony, and on two occasions moved for a mistrial. He claims that it was improper to ask questions pertaining to credibility before Miss Smith had given any other testimony, that the convictions brought out were incompetent to reflect on credibility since they were only for misdemeanors not involving moral turpitude, and that Murray was unduly prejudiced by the possible inference from his close connection with Miss Smith that he also had engaged in policy dealings.

The last claim of prejudice is without merit in view of Judge Dawson's meticulous corrective instructions. He asked Miss Smith explicitly whether her convictions had been in connection with any work she had done for Murray, and her answer was negative. He then went on to say "The jury will realize the fact that she has been convicted is not any indication that Mr. Murray had anything to do with the policy racket," and he stated that the testimony as to the conviction was to be considered only with relation to her credibility.

We find it unnecessary to consider whether it was error under the circumstances to permit the government to go into the credibility of its own witness in this way at the very outset of her testimony.[1a] As this case evolved there

---

[1a]. In any event, Murray waived any objection to the use of misdemeanor convictions to reflect on credibility by his failure to raise the point specifically at trial. He should not be permitted to raise on appeal a new point which he did

was no possibility of any prejudice to Murray from any attack on Miss Smith's credibility. She gave no affirmative testimony which was in any way helpful to Murray, and in fact Murray's counsel felt it desirable to argue in his summation that her testimony should not be believed. Thus Murray was more helped than harmed by any attack on her credibility, whatever the government's original motivation may have been.

C. *Admission of Books and Records* —At the trial, the government asked Murray's counsel "to produce the books and records of a corporation known as 561–563 West 144th Street Realty, Inc." On the previous day, the trial judge (off the record and thus apparently out of the hearing of the jury) had advised counsel that unless the books and records were turned over to the prosecution voluntarily, a subpoena would be issued. In court, defense counsel stated to the trial judge that "I have them here, and if you direct me to turn them over, I will." When the judge responded "Yes," the papers were made available to the prosecution without any objection or restriction. When, however, during its examination of a former employee of Murray's accountant, the prosecution attempted to introduce them into evidence, the defense objected to the admission of some of them on the ground of the privilege against self-incrimination in that the books and records also contained personal records of the defendant.

■ Murray claims error in the trial judge's failure to give a requested corrective instruction after the government had asked for the records in the presence of the jury. No such instruction was needed, since there was nothing prejudicial in the wording of the request, as

quoted in the preceding paragraph. No privilege attached to the *corporate* records requested; this is not, like People v. Minkowitz, 220 N.Y. 399, 115 N.E. 987 (1917), a case where the prosecution attempted to prejudice the defendant by making known to the jury the existence of inadmissible personal records.

■ Nor was the fact that before trial Judge Weinfeld had denied the government's motion for inspection of these documents of any relevance. The grounds for the denial had nothing to do with the admissibility of the documents at trial; Judge Weinfeld merely held that the government had shown insufficient need to have them *before* trial.

■■ Finally, we hold that defendant's objection to the admission of the books in evidence was both too late and not in the proper form. The privilege against self-incrimination does not prohibit the introduction of incriminating matter in evidence; it merely forbids it to be obtained from the defendant. See Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913). The time for the defense to object on the grounds that the records were personally incriminating was before they were turned over to the prosecution, not when the prosecution later attempted to use them in the actual examination of the accountant. Moreover, the defense had a right to withhold only those records which were personal. The rights of the defendant could have been amply protected if the defense had offered to the government only those parts pertaining to the corporation and had withheld the rest. In any event, the government made no use of the parts of the books pertaining to Murray's personal affairs, and there is no indication that there was in them any matter prejudicial to him.

not give the trial judge an opportunity to pass upon. See, e. g., United States v. Sansone, 231 F.2d 887, 891 (2 Cir.), cert. denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956). Timely objection was especially necessary here because it is not clear on the record what the nature of the convictions was. If, as is likely, they were in fact only for mis-

demeanors (the policy violations probably having been under New York Penal Law, McKinney's Consol.Laws, c. 40, § 974 and the election violation probably under New York Penal Law, § 757(2)) it would have been error to permit their use for impeachment purposes over proper objection. See United States v. **Pro**voo, 215 F.2d 531, 536 (2 Cir. 1954).

### III. *Contradiction of the Government's Bill of Particulars in Its Summation*

Appellant also claims error in the trial court's permitting the government to argue in its summation that there was no evidence supporting exemptions for three dependents when it had stated in its bill of particulars and in the testimony of the investigating Internal Revenue agent that for purposes of calculating Murray's taxable income on the net worth theory it had allowed three exemptions. Murray's counsel argued in his summation that lack of willfulness could be inferred from the fact that in the allegedly fraudulent returns Murray had not attempted to take exemptions for his three children. The government countered with the argument that there was no evidence in the record to show that Murray qualified for the exemptions by actually supporting the children. The trial judge rejected a request that he charge the jury that the government had actually allowed the exemptions, saying "I am not in my charge going to go into minutiae of the case."

Appellant's argument rests on the proposition that a bill of particulars binds the government for all purposes in the case in which it is given. The function of a bill of particulars is to enable the accused to prepare for trial and to prevent surprise, and to this end the government is strictly limited to proving what it has set forth in it. See, e. g., United States v. Neff, 212 F.2d 297, 309 (3 Cir.1954). But saying that the government's case is limited to what it has specified is not the same as saying that for all purposes statements in a bill of particulars are evidence in the case. The bill of particulars merely stated that in arriving at the amount of taxable income alleged in the indictment it had allowed the defendant "four exemptions in each of the years contained in the indictment—one exemption for himself and three for his children." It was not an admission that such exemptions were actually allowable. See United States v. Nunan, 236 F.2d 576, 588 (2 Cir.1956), cert. denied 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957). It was nothing more than a decision not to contest the propriety of the three exemptions which Murray might claim.

The bill of particulars is not evidence of itself; it is merely a statement of what the government will or will not claim. Thus the record was barren of evidence as to whether Murray supported his three children. Of course the defendant could have sought a concession on this from the government or could have adduced proof of it. As it was, Murray's counsel chose to make the argument despite the fact that the record contained nothing to support it. Under these circumstances it was entirely proper for the government to argue, in answer to the summation of Murray's counsel, that there was no proof in the record that he was entitled to the exemptions.

### IV. *Pretrial Inspection of Murray's Statements to the Internal Revenue Service*

The final point for our consideration is the assignment of error in Judge Edelstein's denial of the defense's pretrial motion for inspection of the transcripts of Murray's several voluntary interviews with agents of the Internal Revenue Service. The motion was based alternatively on Rules 16[2] and 17(c)[3] of the

2. Rule 16, Federal Rules of Criminal Procedure.

"Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable."

3. Rule 17(c), Federal Rules of Criminal Procedure.

"A subpoena may also command the person to whom it is directed to produce

Federal Rules of Criminal Procedure, 18 U.S.C.A., and Section 6(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1005(b).[4] Judge Edelstein held that the defense had made insufficient showing of the "materiality" required for discovery under Rule 16, that pretrial inspection pursuant to subpoena was unavailable under Rule 17(c) because it had not been shown that the statements were "evidentiary and relevant," and that Section 6(b) of the Administrative Procedure Act was inapplicable because the statements had not been "compelled" by the Revenue Service. Because of the division among the district judges of this circuit[5] as to pretrial inspection of a defendant's own statements, we shall elaborate the reasons for our affirmance of Judge Edelstein's denial of the motion.

■ A. *Rule 16*—We hold that a transcription of a question and answer examination of one who later becomes a defendant in a criminal action is not discoverable by him under Rule 16 as within the category of "books, papers, documents or tangible objects, obtained from or belonging to the defendant." The language of Rule 16, its evolution in the Advisory Committee, see United States v. Peltz, 18 F.R.D. 394 (S.D.N.Y. 1955), and the Committee's final explan-

atory Note[6] all indicate that Rule 16 applies only to books, papers, documents or tangible objects in which a defendant has had some prior proprietary or possessory interest. The great weight of authority supports our unwillingness to stretch the word "belonging" to the point of saying that a stenographic transcript of a defendant's words "belongs" to him. See Shores v. United States, 174 F.2d 838, 11 A.L.R.2d 635 (8 Cir.1949); Schaffer v. United States, 221 F.2d 17 (5 Cir.1955); Kaufman, Criminal Discovery and Inspection of Defendant's Own Statements in the Federal Courts, 57 Colum.L.Rev. 1113, 1114 (1957); Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1053 (1961). Although Murray's Q-and-A statements were not signed, we can see no reason why a signed statement would any more have "belonged" to him within the meaning of the rule.

Although on this analysis, it is unnecessary for us to pass upon the assertion in the district judge's order that the statements were not "material" to the preparation of Murray's defense, it would seem to us that the statements were material.

■ B. *Administrative Procedure Act § 6(b)*—We agree with Judge Edelstein that Section 6(b) is inapplicable to

the books, papers, documents or other objects designated therein * * * The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

4. Section 6(b), Administrative Procedure Act, 5 U.S.C. § 1005(b).
   "Issuance of process; investigations; transcript of evidence. * * * Every person compelled to submit data or evidence shall be entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good

cause be limited to inspection of the official transcript of his testimony."

5. Compare, e. g., United States v. Peace, 16 F.R.D. 423 (S.D.N.Y.1954) (allowing inspection under Rule 16) with, e. g., United States v. Peltz, 18 F.R.D. 394 (S.D.N.Y.1955), (denying inspection under both Rule 16 and Rule 17(c)). For a recent thorough collection of the cases, both within this circuit and elsewhere, see United States v. Fancher, 195 F. Supp. 448 (D.Conn.1961).

6. The Note states that the rule is a "restatement" of the procedure whereby the courts had "made orders granting to the defendant an opportunity to inspect impounded documents belonging to him. * * * *" It would be strange to speak of "impounding" a transcript, signed or unsigned, which had never been in a defendant's possession.

the statements Murray voluntarily made to the Internal Revenue Service. By its terms Section 6(b) applies only to persons "*compelled* to submit data or evidence," and Murray's appearances were not pursuant to summons issued under § 7602 of the Internal Revenue Code of 1954, but rather were made of his own volition. Thus the case before us is distinguishable from Backer v. Commissioner, 275 F.2d 141 (5 Cir.1960) and United States v. Smith, 87 F.Supp. 293 (D.Conn.1949), which held § 6(a) applicable to insure representation by counsel in a hearing held pursuant to a subpoena.

■■■ C. *Rule 17(c)*—Although a Rule 17(c) subpoena might under some circumstances be used to compel the government to produce the transcript of a defendant's statement for his use as evidence, Murray gave no reason which would have justified Judge Edelstein in exercising his discretion to require the government to produce his statements for inspection before the trial.

"Rule 17(c) was not intended to provide an additional means of discovery," Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951). Its purpose is rather that of the traditional subpoena *duces tecum,* to permit a party to obtain "books, papers, documents or other objects" for use by him as evidence. The provision for pretrial inspection is merely a subsidiary one, "to expedite the trial by providing a time and place *before* trial for the inspection of the subpoenaed materials." Id. at 220, 71 S.Ct. at 679; see Kaufman, supra, at 1116; Note, 67 Harv.L.Rev. 492, 496–97 (1954). We cannot agree with the implication in Fryer v. United States, 93 U.S.App.D.C. 34, 207 F.2d 134, cert. denied 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 389 (1953), that the mere likelihood that the government will use a defendant's statement as evidence (as Murray's

statements were in fact used at trial) makes them "evidentiary" within the meaning of Rule 17(c) as interpreted by the Supreme Court in Bowman. If Rule 17(c) is interpreted to allow the defense to inspect any matter in the government's hands which might be used by it as evidence, we see little meaning left in the court's clear statement in Bowman that it is not an additional discovery device. Rather, we interpret Bowman as saying that Rule 17(c) is a device solely for the obtaining of evidence for the use of the moving party, permitting him to examine the material obtained before trial only where, in the discretion of the court, it is necessary that he do so in order to make use of the material as evidence.

The only apparent evidentiary use to which a defendant could put his own statement would be to impeach the testimony of a government witness about its contents or, perhaps, to bolster his own testimony by showing its consistency with the prior statement in the event that the government introduced evidence of some other inconsistent statement. To be sure, we see no reason why *after* the government introduces such testimony at trial a defendant could not use Rule 17 (c) to subpoena his prior statement for his own use. Cf. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Although Jencks eliminated any requirement of a prior foundation of inconsistency (in the case of third-party witnesses), the Supreme Court did not say that it was not necessary for the defendant to show some fairly immediate evidentiary need for the statements he sought, and it reaffirmed that it was not permitting a fishing expedition in the manner of discovery. We cannot say that there may never be a situation where it would be appropriate to allow a defendant to examine his own statement before trial.[7] Here, however,

7. Judge Kaufman's article suggests the situation where the preparation of a defense of insanity might require inspection of the transcript of a psychiatric examination. Kaufman, supra, at 1120.

Judge Kaufman also discusses the possibility, raised in Shores v. United States, 174 F.2d 838, 845, 11 A.L.R.2d 635 (8 Cir. 1949), of an inherent judicial power to allow discovery, in cases of need,

Murray had made no showing of such special need. Murray had counsel with him at each interview and it is hardly to be supposed that he and his counsel were without any notes of what had happened and without any memory of what was said. Under ordinary circumstances, such as these, we see no reason why there should not be sufficient time for defense counsel to make whatever impeaching or bolstering use of a statement he can if he obtains the transcript at trial. Murray has made no showing that he was in any way prejudiced by reason of not having had his statements made available to him before trial.

Affirmed.

where it is not explicitly provided for in the rules. He concludes that "the courts remain free to direct discovery under their inherent authority to administer justice in federal courts." Kaufman, supra, at 1121. We need not here consider whether such power exists, since the facts of this case fall far short of showing any earlier need for the statements.