**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Stanton FREEMAN, Defendant-Appellant.**

**No. 1050, Docket 74-1238.**

United States Court of Appeals, Second Circuit.

Argued May 2, 1974.

Decided June 7, 1974.

Myron Beldock, New York City (Kathleen C. Wresien and Beldock, Levine & Hoffman, New York City, of counsel), for defendant-appellant.

(Edward John Boyd, V., U. S. Atty., Eastern District of New York, and Paul B. Bergman, Asst. U. S. Atty., of counsel), for plaintiff-appellee.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

An indictment in the District Court for the Eastern District of New York charged Kim Ornitz, Marilene Tombini, Francisco Rudge, Hermano Albuquerque, Rosalys Rudner and appellant Stanton Freeman with conspiring between May 15 and June 18, 1973, to import cocaine into the United States, and with three substantive offenses—the importation of five pounds of cocaine, possession of the cocaine with intent to distribute it and

possession of the cocaine on board an aircraft arriving in the United States, in violation of 21 U.S.C. §§ 952(a), 841(a)(1) and 955. The charges against Albuquerque were dismissed prior to trial. Tombini and Rudge pleaded guilty to the possession on board charge and testified for the Government. Rosalys Rudner is a fugitive.[1] The case against Ornitz and Freeman was tried to Chief Judge Mishler without a jury. At the conclusion of the Government's case, he dismissed the charges against Ornitz for lack of sufficient evidence. This left only Freeman, who testified in his own defense and presented other witnesses. In a memorandum of decision Chief Judge Mishler found him guilty of the conspiracy and of the three substantive offenses and sentenced him to concurrent terms of two years imprisonment and five years special parole.

Freeman's principal attack, and the only one we need to consider, is directed at the sufficiency of the evidence. It is common ground that Freeman never possessed the cocaine, either directly or "constructively," and consequently never possessed it with intent to distribute, never possessed it on board an aircraft, and did not actually import it; his conviction on the substantive counts must rest upon his conviction for conspiracy under the doctrine of Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L.Ed. 1489 (1946), or conceivably, on his being an aider or abettor. It is also clear that the standard of review is no longer the rather low one of United States v. Tutino, 269 F.2d 488, 490 (2 Cir. 1959), urged by the Government, namely, "whether, taking the evidence in the view most favorable to the government, there is substantial evidence to support the verdict", here the judgment. Rather, despite United States v. Dudley, 260 F.2d 439, 440 (2 Cir. 1958), which followed United States v. Costello, 221 F.2d 668, 671 (2 Cir. 1955), aff'd without discussion of this point, 350 U.S. 359, 76 S.Ct. 406, 100 L. Ed. 397 (1956), the test to be applied in reviewing the sufficiency of the evidence after a bench trial is the same as the one we have since adopted, United States v. Taylor, 464 F.2d 240 (2 Cir. 1972), overruling the Costello and Tutino line of cases, when the issue is the propriety of submission to a jury. Adapting Judge Prettyman's formulation in Curley v. United States, 81 U.S. App.D.C. 389, 160 F.2d 229, 232–233 (D.C. Cir. 1947), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), with respect to jury trials, which we endorsed in Taylor, the test here is whether upon the evidence, giving full play to the right of the trial judge to determine credibility, weigh the evidence, and draw justifiable inferences of fact, "a reasonable mind might fairly conclude guilt beyond a reasonable doubt." This does not alter the principle that after a conviction we consider the evidence "in the view most favorable to the government"; it simply raises the level that the evidence so considered must meet.

Despite some criticisms by defense counsel, we accept Chief Judge Mishler's account of the conspiracy and its unravelling up to the time of Freeman's first appearance with any of the other persons charged. Omitting footnotes, this is as follows:

In the Spring of 1973, Francisco Rudge travelled to his native Brazil from the United States. During a stopover in Bolivia he learned that he could purchase pure cocaine at $2,500.-00 per kilo without difficulty. When he returned to the United States, he met with one George Morao at his room in the Hotel Albert on East 10th Street in Manhattan, and discussed the importation of cocaine. Morao assured Rudge that he would have no difficulty disposing of the cocaine. In May 1973, Rudge and Morao met again in Rudge's room at the Hotel Albert with one Rosalys Rudner to

---

1. So is George Morao, a defendant in a separate indictment, who figures prominently in this case.

discuss plans for importing cocaine from Bolivia. Rosalys Rudner, a national of Brazil, lived with Rudge at the Hotel Albert. It was decided to arrange for the importation in June.

\* \* \* \* \* \*

Rudge and Rudner decided to enlist the aid of one Marilene Tombini as a courier in the plan. Tombini, a national of Brazil, was then residing in London. Rudge and Rudner flew to London where they met with Tombini. Tombini agreed to play the assigned role in the plan. Rudge paid for Tombini's return to New York. Tombini came to New York on June 2nd. The plans were finalized at a meeting in Rudge's room at the Hotel Albert in early June, attended by Rudge, Rudner and Tombini. Rudge agreed to supply the funds. Tombini was to fly to Buenos Aires, Argentina. Rudge and Rudner were to fly to Bolivia and Rudner thereafter was to meet Tombini with the cocaine in Buenos Aires.

Rudge left John F. Kennedy International Airport on June 6th for Bolivia on Braniff Airlines. Rudner left for Bolivia on Lufthansa on the same day. Tombini left for Buenos Aires on June 7th on Argentina Airlines. Rudge purchased two (2) kilograms of cocaine in Bolivia at $2,500.00 a kilo. He turned it over to Rudner, who then left for the Sheraton Hotel in Buenos Aires to meet Tombini. Rudge returned to New York at the John F. Kennedy International Airport in the early hours of June 13th.

Rudner delivered two suitcases in which were concealed the two kilograms of cocaine. The next morning, Tombini put her personal belongings into the two suitcases. Rudner and Tombini boarded a Pan American flight to New York. Tombini was arrested as she attempted to pass through Customs. Rudner had taken a position on a fast moving line at a Customs checkout counter and lost sight of Tombini. Rudner in the meantime waited at the Terminal outside of Customs. When Tombini failed to exit from Customs, Rudner surmised that Tombini had been arrested.

Rudner took a taxi to the Hotel Albert to report her suspicions to Rudge. She came with two suitcases. Rudge, understanding the gravity of the situation, suggested that Rudner pack the clothing and other personal effects that she had left in his hotel room and go to the Hotel Paramount on 46th Street, near Broadway. She took a taxi and registered at the Paramount Hotel in the early hours of June 14th.

After Rudner left the Hotel Albert, Rudge called Morao, his prospective purchaser. Rudge informed Morao that he had sent Rudner to the Hotel Paramount, and the two discussed the probability of Tombini's arrest.

Rudge was arrested at about midnight on June 13th on the information supplied by Tombini. Morao learned of the arrest and advised Rudner.

Judge Mishler relied on three sets of circumstances in reaching the conclusion that Freeman was a member of the conspiracy. Two of these can be stated quite briefly; the third and most important will require more detail. Before going into any of this we must give some description of Freeman, postponing at this juncture the facts on which the Government relies to show his participation in the conspiracy.

At the time of the offenses here charged, Freeman, a 39-year-old Canadian citizen and a permanent resident of the United States, lived in West Greenwich Village, Manhattan, with his wife and two children. He had worked in a Canadian electronics firm and then in what is described as the "music business." In 1966 he opened a multimedia night club, the Electric Circus. He subsequently met Morao, a film maker and photographer, and Morao's common-law wife, Theresa Costa, also a Brazilian,

and established a social relation with them. They had been in each other's homes and had gone out together.

In May and June, 1973, Freeman was preparing to open two night clubs in the Hotel Diplomat on West 48th Street in New York City and was working at least 18 hours a day in that endeavor. On June 8 Morao phoned Freeman to tell him that he had returned from South America and to ask Freeman to recommend an attorney to represent Theresa Costa on an immigration problem, which Freeman subsequently did. On June 10 Morao brought a gift from South America to Freeman at his home, where they discussed the possibility of Morao's supplying a large quantity of shishkebab for the opening of Freeman's nightclubs —a plan which, after some further conversations, ultimately fell through.

The first item of evidence relied on by the district court to implicate Freeman in the 1973 importation conspiracy was the testimony of Mark Etra. Etra first met Freeman in September 1971 at the latter's Greenwich Village home where Freeman was attempting to sell him audio equipment. Etra, an importer of cocaine, brought with him some which they used. Freeman said he would be interested in obtaining large quantities of cocaine if Etra could deliver it to him on a fairly regular basis.[2] Etra said that might be possible, but that he would have to talk to some other people about it; in response to a number of telephone requests from Freeman, Etra subsequently delivered a sample of approximately a gram. While there was then some further discussion of the possibility of procuring more cocaine, Freeman never pursued the matter, and no sale was ever arranged between the two. The Government makes no claim that there was any relationship between Etra and Morao or Rudge.

The second item relied on by the court concerned cocaine dealings between Freeman and Morao. Agent Silvestro testified to an admission by Freeman to an agent which is set forth in the margin.[3] Ornitz testified that, over a year and a half before the spring of 1973, he and Freeman occasionally pooled their funds to purchase from Morao small quantities of cocaine for their own use—totalling at most a quarter of an ounce. Ornitz also said that a year to a year and a half prior to June 1973, Freeman at his request obtained an ounce of cocaine from Morao, which they turned over to a friend of Ornitz' at cost. Freeman conceded that he knew Morao dealt in cocaine.

█ Connecting the two items, the judge found that Freeman met Morao at about the time of his conversation with Etra and that "Morao became Freeman's regular source of supply." If this was meant to imply that this testimony was sufficient to justify beyond a reasonable doubt a conclusion that Freeman had cast Morao in the role of a large-scale supplier of cocaine which he had discussed with Etra, we think the evidence was well short of that mark. The testimony showed only that Freeman had at one time expressed an interest in large quantities of cocaine to a person having no connection with the conspiracy but had then done nothing about it; and that Freeman and Ornitz were users of cocaine, had acquaintances who also were, and had occasionally availed themselves of Morao to meet the needs of themselves and their friends—all in small quantities, without a profit motive, and at a time long prior to the conspiracy here charged. There is a wide gap between this and the showing required by our decisions that, in order to hold a man for joining others in a conspiracy, he "must in some sense promote their

---

2. Cross-examination developed some question as to who had taken the initiative.

3. "He [Freeman] said, however, that in the past, primarily for business reasons, he had purchased small amounts of cocaine

from Mr. Morao and had himself sold or transacted small amounts of cocaine as merely a business accommodation in the line of work, in the music and nightclub industry, and some of this cocaine was cocaine that he had gotten from Mr. Morao."

venture himself, make it his own," United States v. Falcone, 109 F.2d 579, 581 (2 Cir.) (L. Hand, J.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

In view of the negligible, indeed almost non-existent, inferences that can be drawn from the evidence recited up to this point, any conclusion that Freeman was a member of the conspiracy during the operational phase must rest on the evidence about Freeman's activities after Rudge's arrest on June 13, 1973.

While the testimony is conflicting, the court could permissibly have concluded that, in the early hours of June 14, Morao, Theresa Costa and Rosalys Rudner came to Freeman's apartment, although Freeman did not see them until he arrived from the night club later in the morning; [4] that on June 16 Freeman, as a favor to Morao, went to the Hotel Albert, paid some money on Morao's and Costa's bill, and retrieved some of the photographic equipment and luggage; and that upon request Freeman arranged for a barber, who was a friend of his, to come to his apartment and cut Rudner's hair. There was also testimony by one David Duffy that on June 16, while at Freeman's apartment, he and Morao discussed getting Rudner into Canada via Vermont, a conversation which there is no evidence that Freeman heard; [5] that one or the other of them asked Freeman if he had any maps of that area; and that Freeman tossed over a plastic travel pack containing "a whole lot of maps in there, one of which was New England." Rudner, who had registered at the Paramount Hotel late on June 13 after reporting Tombini's

disappearance to Rudge and before she had learned of Rudge's arrest, was unwilling to flee to Canada without the two bags in which, at Rudge's suggestion, she had repacked her personal belongings and which had remained at the Paramount. She had not returned to the hotel after her arrival at Freeman's apartment, for fear of surveillance, and it was thought unwise for her to do so. Morao enlisted Freeman in the enterprise of retrieving the bags.

Around midday on June 18, Freeman called the hotel and told the assistant manager that Rudner's baggage was in her room but that she could not return for it. On being informed by a bellboy that government agents were watching to see if anyone picked up the bags, the assistant manager advised that they were in the checkroom and that in order to get them it would be necessary to pay the bill. Freeman said this would be no problem. Later in the afternoon, Freeman's friend Ornitz came by the Hotel Diplomat accompanied by one John Spencer Davis; Ornitz had told Davis that if they dropped in on Freeman, they "might be able to get a blow of coke." [6] After a private talk between Freeman and Ornitz, Freeman had a brief conversation with Davis. Freeman explained "there is this chick who is hot and she is a cocaine smuggler and her bags are at the Hotel Paramount, which is four blocks away." Freeman asked Davis whether he would pick up the bags; when Davis inquired how anyone could smuggle cocaine these days, Freeman answered that Rudner was a photography student and had a lot of equipment.[7] There was a rather ram-

4. Counsel for Freeman contends, with considerable force, that a much more reasonable version is that Morao and Costa came only on June 15 and that it was not until the early morning of June 16 that Freeman gave permission for Rudner to come.

5. Duffy testified that Freeman was spending "close to 90 percent of the time he was there . . . on the telephone", and that he "had about 17 telephones"!

6. In all of this we follow the testimony of Davis, which is the most favorable to the

Government, rather than that of Ornitz or Freeman.

7. The Government seems to suggest that this somehow links Freeman with Tombini and Rudge, both of whom knew of Rudner's photographic interests. But there was no evidence that Freeman had ever seen either, and it is much more reasonable to suppose that he acquired the information from Morao who was also a photographer and known to Freeman to be such, or, by translation on the part of Morao or Costa, from Rudner herself.

bling discussion of the compensation for Davis' services, which might be a small amount of money, a share of the small amount of cocaine which Freeman thought to be in the bags,[8] or both. Freeman gave Davis $60 in cash to pay the hotel and warned that, if arrested, Davis was not to mention Freeman "because of the people I know and a thing like this they can follow up, my friends and me, and they can find Rosalys Rudner and we are about ready to get her out of town." Instead, Davis was to say he met a man in the Hotel Diplomat who had offered him $100, which Davis needed, to pick up the suitcases.

As might be expected, while he was leaving the Paramount Hotel with the bags, Davis was arrested. He told the customs agents everything he knew and led them to Freeman at the Hotel Diplomat. Freeman, who had been alerted by Ornitz, refused to accept the bags. Having obtained access to a telephone, he called Morao at the Greenwich Village apartment and spoke the single word, "split". Apparently the advice was heeded. After a call that night from Costa in the course of which Freeman told her she need not bother to call or contact him any more, both Morao and Costa left the country. The next day, Freeman was arrested.

■ It is clear beyond peradventure that the evidence would have warranted conviction of Freeman as an accessory after the fact under 18 U.S.C. § 3, if the indictment had included a count to that effect.[9] But the mere fact that a person "receives, relieves, comforts or assists" one who has been a member of an aborted or completed conspiracy does not make him a participant in the conspiracy or liable for substantive crimes commited during the pendency of the conspiracy, see Bollenbach v. United States, 326 U.S. 607, 610–611, 66 S.Ct. 402, 90 L.Ed. 350 (1946); Levine v. United States, 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966); Cleaver v. United States, 238 F.2d 766, 770 (10 Cir. 1956); Roberts v. United States, 416 F.2d 1212, 1220–1221 (5 Cir. 1969). To be sure, the indictment alleged that

> It was further a part of said conspiracy that the defendants would conceal the existence of the conspiracy and would take steps designed to prevent disclosure of their activities.

But we read Grunewald v. United States, 353 U.S. 391, 401–406, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), as forbidding us to hold Freeman guilty of the narcotics conspiracy here charged simply because he became a party to an effort to conceal several of the conspirators after the initial scheme had miscarried. As Mr. Justice Harlan warned in *Grunewald*, an express agreement to conceal cannot be implied "from elements which will be present in virtually every conspiracy case, that is, secrecy, plus overt acts of concealment," 353 U.S. at 404, 77 S.Ct. 963. "[T]he essential missing elements," the Justice added, "is a showing that the act [here, concealing the principals] was done in furtherance of a prior criminal agreement among the conspirators," *id.* at 404 n. 16, 77 S.Ct. at 973.[10]

---

8. The agents found 3.5 grams of cocaine and some cocoa leaves in the bags, concededly not a part of the shipment sought to be imported on June 13.

9. Since Freeman was obviously aware that he was sheltering at least one person (Rudner) who was guilty of importing cocaine, the evidence of various false statements made by him after his arrest and the consequent inference of consciousness of guilt, see United States v. Smolin, 182 F.2d 782, 785–786 (2 Cir. 1950), are not probative of Freeman's participation in the conspiracy.

10. Of course, where the act of concealment is done in furtherance of the main criminal objectives of the conspiracy, the initial agreement can fairly be said to include the concealment phase, see Ingram v. United States, 360 U.S. 672, 679 n. 10, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); Forman v. United States, 361 U.S. 416, 422–424, 80 S. Ct. 481, 4 L.Ed.2d 412 (1960); United States v. Franzese, 392 F.2d 954, 963–964 (2 Cir. 1968), vacated on other grounds 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); United States v. DeSapio, 435 F.2d 272, 283–284 (2 Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166

576

That does not mean, however, that a person's efforts to assist in the concealment of a conspiracy may not be such as to support an inference that he had joined it while it was still in operation. If there had been even slight evidence of other sorts that Freeman was a participant in the plan to import the five pounds of cocaine from South America, his lodging of Morao, Costa and Rudner in his apartment, the favors rendered during their visit, his obviously dangerous effort to retrieve Rudner's luggage, his telephone warning to "split," and his later talk with Costa would bring the case within such decisions as United States v. White, 124 F.2d 181, 185 (2 Cir. 1941); United States v. Monica, 295 F.2d 400, 401 (2 Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962), and United States v. Frank, 494 F.2d 145, 152 (2 Cir. 1974), slip opinions 1883, 1895, which emphasize that the Government's evidence must be taken as a whole and that each relevant fact tending toward guilt gains color from each other. But here, as it seems to us, there was no really pertinent evidence of guilt other than Freeman's efforts after the conspiracy had failed. One can speculate, of course, that mere friendship with Morao and gratitude for an occasional sale of small amounts of cocaine would not lead anyone into a course of criminal conduct so far beyond anything that these relations could fairly be thought to inspire, and that Freeman's actions after June 13 thus are explicable only on the theory that he was playing a part in an endeavor he had been engaged in from the outset. But the mores of the world where Freeman lived are not those of judges or clergymen, and the inference that his criminal activity was that of an accessory after the fact, and nothing more, is far more compelling than the inference that he was a prior participant.[11]

This may be the rare case where the raising of the standard of review effect-

ed by our decision in United States v. Taylor, *supra*, 464 F.2d 240, leads to a different result than would have obtained under the principle there overruled. Although the case is close, we have no real question that if this had been a jury trial, we would have held it was error for the judge to submit it to the jury on the basis that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Here we face the difficulty that a most reasonably minded judge, for whom we entertain the greatest respect, with the advantage of seeing and hearing Freeman and the other witnesses, has reached just that conclusion. But the standard of review cannot differ simply because there has been a bench rather than a jury trial; we are bound to apply it to a judge's determination of guilt exactly as we would to his decision to permit the case to go to the jury.

The judgment is reversed with instructions to dismiss the indictment as against Freeman.

(1971); United States v. Colasurdo, 453 F. 2d 585, 591–593 (2 Cir. 1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972).

11. The case would stand differently if Freeman's post-June 13 acts were serious independent crimes, *e. g.*, if he had assaulted the agents who had retrieved Rudner's bags.