**UNITED STATES of America,
Appellee,**

v.

**Walter Augustus BOWE, Robert Steele
Collier, and Khaleel Sultarn Sayyed,
Defendants-Appellants.**

**No. 161, Docket 29881.**

United States Court of Appeals
Second Circuit.

Argued Feb. 24, 1966.

Decided April 28, 1966.

Harvey P. Dale, New York City (Anthony F. Marra, New York City, on the brief), for appellants Bowe and Sayyed.

Len Holt, Washington, D. C. (J. A. Jordan, Jr., Norfolk, Va., on the brief; James Lee, Detroit, Mich., of counsel), for appellant Collier.

Pierre N. Leval, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City, John S. Allee, David M. Dorsen, Jack Kaplan, Asst. U. S. Attys., on the brief), for appellee.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge.

On March 2, 1965, an indictment was filed against appellants Walter Bowe,

Robert Collier, and Khaleel Sayyed [1] charging them with conspiring to destroy government property and to smuggle explosives into the United States, in violation of 18 U.S.C. §§ 371, 545 and 1361; [2] and with smuggling in violation of 18 U.S.C. § 545. Subsequent to the denial of appellants' motions to dismiss the indictment on the grounds that it was legally insufficient and that the grand jury had been improperly selected, trial was commenced on May 17, 1965. At trial the Government attempted to show that the appellants had devised a plan to destroy certain national monuments, to wit, the Statue of Liberty in New York harbor, the Liberty Bell in Philadelphia, and the Washington Monument, and that they intended to carry out their plan with the aid of explosives which they arranged to have smuggled into the United States from Canada. The Government's chief witness was Raymond Wood, an undercover agent of the New York City Police Department. He testified that he first met Collier in December, 1964 and that he first met Bowe and Sayyed at a meeting at Collier's apartment on January 19, 1965, called to devise a way "to get next to this country." At that meeting, according to Wood, Bowe suggested blowing up the Statue of Liberty but Sayyed felt the project was too big and urged that they conduct stick-ups in Harlem. Wood and Collier objected to the stick-up proposal and after Wood stated, "I think Bowe has the best plan and I think we ought to go along with that one," Sayyed voiced his approval. As the meeting ended, they all agreed to make separate trips to the Statue of Liberty and to meet again on January 26. Wood testified that at the January 26th meeting they all reported on their trips to the Statue and that Bowe indicated on a replica of the Statue where he thought the explosives should be placed. Then, Collier informed Bowe and Sayyed that he and Wood were going to Montreal where his girl-friend, Michelle Saunier, would provide them with dynamite, and they discussed the problem of smuggling the explosives into the United States. Subsequently, according to Wood, Bowe said that he thought the job was too easy to require the efforts of all four and that they ought to consider blowing up the Liberty Bell and defacing the Washington Monument. Sayyed allegedly replied that he knew a friend who would love to get in on something of that nature.

On January 29th Wood and Collier drove to Montreal. There, they stayed at Michelle Saunier's apartment and met with Michelle Duclos, a member of a Quebec separatist organization, who told

1. The indictment also named Michelle Duclos and Michelle Saunier as defendants. Prior to trial, Duclos pleaded guilty to violating 18 U.S.C. § 545, and Saunier, who was not subject to process, was severed from the trial.

2. 18 U.S.C. § 545 provides in pertinent part: "Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

Shall be fined not more than $5,000 or imprisoned not more than two years, or both."

18 U.S.C. § 1361 provides: "Whoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, shall be punished as follows:

If the damage to such property exceeds the sum of $100, by a fine of not more than $10,000 or imprisonment for not more than ten years, or both; if the damage to such property does not exceed the sum of $100, by a fine of not more than $1,000 or by imprisonment for not more than one year, or both."

18 U.S.C. § 371 provides in pertinent part: "If two or more persons conspire either to commit any offense against the United States * * * or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

them she would bring some explosives to New York on February 15th.

Upon returning to New York, Wood and Collier met a third time with Bowe and Sayyed and, according to Wood, Collier told them that "the stuff" would arrive on February 15th and asked them all to pitch in $25 to pay for it. No other meeting was planned until after the delivery of the explosives.

Finally, Wood testified that on February 16th Duclos informed him in New York that the explosives were hidden at the back of a parking lot at West 239th Street; and, that after he checked the accuracy of Duclos' report, he picked up Collier and they drove to the lot. On the way, Wood said that Collier informed him that he had been to the Statue a few days before and that he felt the best place to plant the dynamite was beneath two main supporting beams he had observed. When they arrived at the lot, Collier picked up the dynamite and while taking it to the car was arrested.

Both Bowe and Sayyed took the stand and attempted to establish that all plans for violent action had originated with and had been suggested by Wood. Bowe testified that he was an experienced judo instructor and that he had attended the meetings with Wood, Collier, and Sayyed in order to recruit judo students. He said that when Wood suggested blowing up the Statue of Liberty at the January 19th meeting he had replied "why not the Liberty Bell and the Washington Monument, too," and that Wood had said that was a good idea. Sayyed testified that he never intended to participate in any violent action; that he had strenuously resisted all suggestions by Wood relating to destroying national monuments and that he told Wood the Student Non-Violent Coordinating Committee's program of non-violent demonstration was his method of showing dissatisfaction.

Collier did not testify in his own behalf, but his attorney offered to put witnesses on the stand who, he asserted, were prepared to testify that during the spring and summer of 1964, Wood had urged them to participate in certain violent action in New York City, e. g., blowing up the Statue of Liberty and sewers, and stick-ups in Harlem. He argued that the testimony was crucial to the defense of entrapment in that it would impeach Wood's testimony and show his intent toward the appellants. The Government objected to the introduction of such testimony and the court sustained the objection on the ground that the slight probative value of the testimony was outweighed by its propensity to confuse the jury and unnecessarily prolong the trial by introducing collateral issues.

On June 14, 1965, the jury returned verdicts of guilty as to Bowe, Collier and Sayyed on both counts of the indictment and on June 17, 1965, judgments of conviction were entered against them from which the present appeal is taken. Appellants allege that numerous errors were committed during the proceedings below, some of which relate to pre-trial matters, and some of which relate to actions taken and rulings made by Judge Herlands during the trial. We conclude that appellants' allegations are without foundation and affirm the convictions.

I. *Pre-trial:*

(A) *Grand-jury selection:* On March 30, 1965, appellants moved to quash the indictment on the ground that the grand jury was improperly selected in that Negroes, Puerto Ricans, blue collar workers and people of lower income were systematically and intentionally excluded from the grand jury array. The motion was not supported by any affidavit or other proof and was denied without a hearing on April 7, 1965. On April 28, 1965, another motion was filed seeking identical relief, this time supported by an affidavit of Collier's attorney, Len Holt. In the affidavit, Mr. Holt stated that he had visted the federal courthouse at Foley Square on more than a dozen occasions since 1960 and that, based on discussions with former jurors, the deputy clerk in charge of the juries "and information supplied by political figures and the United States census bureau," it was his opinion that Negroes, Puerto Ricans,

and blue collar workers were "grossly unrepresented on the federal jury panels, so that these groups constitute less than 2.5% of the juries." This motion was also denied without a hearing.

On appeal, appellants do not attack the formal method of selecting grand jury members employed in the United States District Court for the Southern District of New York, i. e., the use of voter registration lists as the primary source of names of jurors, for they concede that it has been repeatedly upheld as constitutional on the ground that it does not discriminate against any identifiable racial, social or economic group. E. g., United States v. Agueci, 310 F.2d 817, 833–834, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); United States v. Van Allen, 208 F.Supp. 331, 335–336 (S.D.N.Y.1962); United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y.1961). Rather, they argue that the district court abused its discretion in denying them an opportunity to present evidence at a hearing in support of their claims of discrimination, on the grounds that Holt's affidavit was sufficient to warrant a hearing on the question of systematic exclusion (intentional exclusion is nowhere mentioned in the affidavit) and that the question of intentional exclusion is one of first impression. It is clear, however, that the district court properly denied the motions without a hearing. Len Holt's conclusory allegation of systematic exclu-

sion based on alleged discussions with unnamed persons and information supplied by unnamed political figures certainly did not require the district court to undertake a new and time-consuming investigation of this oft-reviewed subject.[3] "[T]he principles of *stare decisis* are as applicable to this branch of the law as to any other." United States v. Kelly, 349 F.2d 720, 778 (2d Cir. 1965). Moreover, the unsupported assertion of intentional exclusion failed to raise any factual issue which required an examination at a hearing.

(B) *Petit Jury Selection:* On May 18, 1965, the appellants made a motion to dismiss the petit jury array on the ground that the panel of ninety prospective jurors contained only one Negro. The motion was denied without a hearing. Although appellants recognize that the burden of proving either systematic or intentional exclusion of Negroes from the panel rests on them, they argue that by showing a disparity of 89 to 1 they made out a prima facie case of discrimination which shifted to the Government the burden of coming forward with evidence to justify the make-up of the petit-jury array. In United States v. Flynn, 216 F.2d 354 (2d Cir. 1954), however, this court considered and rejected the argument that a gross disproportion of whites to Negroes, even over a substantial period, established a prima facie case of discrimination where, as here, the formal method of selecting the jurors is free from constitutional objection.[4] Id. at

3. Appellants themselves pointed out to this court at oral argument the reason why the mere results of the jury selection system in terms of the representation of Negroes, Puerto Ricans and blue collar workers are not probative which is that members of those groups are predominantly employed in jobs where jury service would result in financial hardship. This court has repeatedly recognized that "as a practical matter and subject to proper supervision by the District Courts, jury officials must be vested with a large measure of discretion to determine whether a particular individual should or should not be excused from jury service," United States v. Kelly, 349 F.2d 720, 779 (2d

Cir. 1965), and, that excusing prospective jurors on the ground of financial hardship does not constitute systematic exclusion. United States v. Flynn, 216 F.2d 354, 386–387 (2d Cir. 1954); cf. 28 U.S.C. § 1863(b).

4. This view is in no way inconsistent with the rule of proof set forth in Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), recently approved by the Court in Swaine v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), to the effect that proof that Negroes, qualified to sit as jurors, *have not been called* for jury service over an extended period of time makes out a prima facie case of

384–385. Compare Smith v. Breazeale, 245 F.Supp. 978 (N.D.Miss.1965).

**■ (C)** *The Indictment:* Collier assigns as error the denial of a motion to quash the indictment made on May 14, 1965, the last court day before trial began. It is alleged that the indictment was defective in that the portion charging offenses under 18 U.S.C. § 545 stated that appellants had aided the transportation of explosives which they knew had been imported into the United States "contrary to law" but failed to specify by number the particular provisions of law to which it referred. After charging the appellants with a violation of Section 545, however, the indictment went on to say that the importation was contrary to law in that the explosives were "not unladen in the presence of and inspected by a customs officer at the first port of entry at which such merchandise arrived in the United States, and in that the required declaration of such [materials] * * * was not made, and in that the prescribed duties on such explosives were not paid." Clearly, the indictment advised the appellants of the essential elements of the offenses with which they were charged and stated facts showing the illegal aspects of the importation. See F.R.Crim.P. 7(c). The explanation of the charge in the indictment makes clear that the claim of insufficiency was "made in a mood of technicalism appropriate only to an era now fortunately past * * *," United States v. Jones, 162 F.2d 72, 73 (2d Cir. 1947) (Frank, J.), and must be rejected. See Huff v. United States, 273 F.2d 56 (5th Cir. 1959); Babb v. United States, 218 F.2d 538 (5th Cir. 1955); cf. Keck v. United States, 172 U.S. 434, 19 S.Ct. 254, 43 L.Ed. 505 (1898). Moreover, Collier has not demonstrated any prejudice as a result of the omission of specific citations, nor could he, for the Government supplied the desired information on May 18, 1965, shortly after the request was made.[5] Thus, the indictment unquestionably satisfied the requirements of Federal Rule of Criminal Procedure 7(c) which provides that the omission from an indictment of citations of provisions of law which have allegedly been violated "shall not be ground for dismissal of the indictment * * * if the * * * omission did not mislead the defendant to his prejudice."

**■** Collier's assertion that count one of the indictment, which charged a conspiracy to destroy government property in violation of 18 U.S.C. § 1361, was defective in that section 1361, in terms, requires a completed act resulting in damage in excess of one hundred dollars is baseless. This contention fails to recognize that the scope of a conspiracy is determined by the scope of the alleged agreement entered into by the conspirators. See, e. g., United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964), cert. denied 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The evidence in the record showing that the appellants intended to blow off the head and arm of the Statue of Liberty, and that they imported thirty sticks of dynamite for that purpose would clearly support an inference by the jury that they contemplated damage in excess of one hundred dollars.[6]

systematic exclusion. Id. at 226–227. Not only have the appellants failed to adduce such proof here, but the *Hernandez* rule is based on the assumption that the jury selection method itself countenances racial discrimination, an assumption which, as pointed out above, was not present in the *Flynn* decision and is unwarranted here.

5. The citations supplied were 19 U.S.C. § 1461 (unloading and inspection required at first port of entry); 19 U.S.C. § 1202 item 485.10 (duty on dynamite), and item 755.40–45 (duty on blasting caps); 19 C.F.R. § 1019 (all items brought into the United States must be declared to a customs officer). It is apparent from an examination of the information provided that the indictment set forth the essential facts underlying the charge against appellants.

6. It was stipulated that damage to the Statue of Liberty would have exceeded $100 had the dynamite been employed in the manner contemplated by the appellants.

(D) *Objections to the Voir Dire:*

(1) *Membership in specific organizations:* The appellants are Negroes. Collier contends that the trial court committed reversible error by failing to ask the prospective jurors certain questions which he submitted as to whether any of the veniremen were members of specific organizations, to wit, the Ku Klux Klan, the White Citizens Council and the Minute Men, on the ground that such information was required in order intelligently to exercise peremptory challenges. We disagree and find that the voir dire conducted by the trial court was sufficient to insure a fair and impartial jury.

The trial judge on two occasions asked the prospective jurors whether any of them had "any bias or prejudice against a person who is a member of the Negro race." Moreover, he asked the panel specifically whether any one of its members was "a member of any organization which is opposed to equal rights under the law or is opposed to racial equality and religious equality." Finally, he said, "in order to be completely sure that these three defendants get a completely fair trial, I want to ask you again whether you * * * realize, that * * * justice must be dispensed regardless of race, color, [or] creed * * *. Is there anybody who has any feeling about this subject that suggests that he or she should be excused from jury service in this case?" There was no affirmative reply to any of these questions. In view of this thorough and straightforward examination of the veniremen concerning potential hostility toward Negroes it cannot be said that the trial judge abused his discretion by failing to designate individually the particular organizations cited by Collier. Cf. United States v. Bando, 244 F.2d 833, 838 (2d Cir.), cert. denied 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957). "[T]he conduct of the voir dire has always been within the discretion of the * * * [trial] judge." United States v. Dennis, 183 F.2d 201, 222 (2d Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); see United States v. Lebron, 222 F.2d 531, 536 (2d Cir.), cert. denied 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955). Moreover, the trial judge is required to submit to the prospective jurors only "such additional questions by the parties or their attorneys as * * * [he] deems proper." F.R.Crim.P. 24(a). Since the court's explicit inquiries as to racial prejudice failed to reveal any such feelings on the part of the prospective jurors, there was no need to subject them to a more detailed inquiry concerning their associations.

Furthermore, under the circumstances, appellants' reliance on Smith v. United States, 262 F.2d 50 (4th Cir. 1958), is misplaced. There, the Negro defendants requested the trial judge to ask the prospective jurors whether any of them were members "of any organizations dedicated toward racial hate, such as the Ku Klux Klan," or "the White Citizen's Council * * * or any similar organization?" He refused, and asked only one general question, as to whether any juror had any bias which would prevent him from giving the parties a fair trial (the question contained no explicit reference to racial basis). The Fourth Circuit held that the voir dire was inadequate and reversed. The voir dire conducted by the court here, however, bears no resemblance to that involved in *Smith*. Any refusal to inquire about membership in specific organizations was, to say the least, counterbalanced by the several questions designed to ascertain whether any prospective juror was prejudiced against any member of the Negro race, or held membership in any anti-negro organization. The examination here was not only more extensive than that conducted by the trial judge in *Smith* but it was directly related to animosity toward Negroes.

Collier also argues that the trial judge abused his discretion by asking the sole Negro venireman whether the fact that he was a Negro would cause him any embarrassment or prevent his rendering an impartial verdict. The alleged basis for this claim is that the questioning might have had an adverse effect on

the white jury members since it focused their attention on appellants' race.[7] There is no evidence in the record, however, to support a claim of prejudice against appellants as a result of this questioning. Moreover, as the Government points out, the pre-trial record raised the possibility that some testimony at trial would touch on questions of racial animosity. Under the circumstances, it was entirely proper to ascertain whether the fact that the prospective juror was a member of the same racial group as appellants would prejudice his views in their favor, or whether he would be disposed to vote for conviction to dissociate himself from their views. See United States v. Jones, 162 F.2d 72, 74 (2d Cir. 1947); United States v. Kertess, 139 F.2d 923, 930 (2d Cir.), cert. denied, 321 U.S. 795, 64 S.Ct. 847, 88 L.Ed. 1084 (1944); cf. Morford v. United States, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815 (1950).

(2) *Pre-trial publicity:* On February 17, 1965, the day following appellants' arrest, the New York Times, the New York Daily News, and the New York Herald Tribune printed certain information concerning appellants which was based in part on a news release dated February 16th, issued by the Federal Bureau of Investigation, and in part on statements made by the United States Attorney for the Southern District of New York: (1) with regard to Collier: it was reported that he had received a "less than honorable discharge" from the United States Army in 1956 after being convicted of slashing a man in a fight in London; and that in 1964 he had travelled to Cuba under the auspices of a student committee organized for travel to Cuba in violation of State Department regulations (the government press release went on to say that Collier was the "self-styled" leader of the Black Liberation Front); (2) with regard to Bowe: that he was a member of the Black Liberation Front and a supporter of the Fair Play for Cuba Committee and Fidel Castro; (3)

with regard to Sayyed: that he was a member of the Black Liberation Front and was reported to have been arrested for assaulting a policeman in December, 1964 while picketing the United Nations as part of a Pan-African Student Movement.

The case was also discussed in various magazines, newspapers and on radio and television prior to trial, as one would expect due to the obvious newsworthy character of a plot to blow up the Statue of Liberty. The trial began on May 17, 1965, and in order to insure that the necessary conditions of a fair trial were not impaired by the pre-trial publicity, the trial judge repeatedly asked the prospective jurors whether they had formed any opinion about the case as a result of anything they had read or heard concerning it. He also inquired as to whether any of the veniremen had seen or heard anything about the case in any news media, and since many of the veniremen indicated that they had, he asked both the members in the jury box and the panel as a whole whether they could put aside such information and determine the guilt or innocence of the appellants according to the evidence presented at trial. Only one prospective juror indicated that he had formed an opinion at the time he read about the case and, in subsequent examination, the trial judge asked him eight searching questions designed to insure that he was capable of rendering an impartial verdict (this juror was not challenged by the appellants). Finally, in addition to examining the entire panel as a whole, the trial judge asked each juror individually whether, upon reconsidering the questions which had been addressed to the entire panel, he knew of any reason why he could not serve fairly and impartially as a juror in this case.

Appellants raise three objections to the voir dire as it relates to pre-trial publicity. First, they contend that the trial judge abused his discretion by fail-

---

7. This prospective juror was excused. Thus, the effect of the questioning on his conduct as a juror is not at issue.

ing to ask questions submitted by them, and in failing to examine each prospective juror individually. There is no support for this contention in the record. The questions put by the trial judge were, in substance, similar to those proposed by appellants. Moreover, they never objected to the form of the trial judge's questions, the manner in which they were put, or requested him to address the jurors individually.

Secondly, appellants contend that the adverse publicity contained in the New York City papers on February 17, 1965 was so prejudicial that it rendered impossible the selection of an impartial jury and urge this court to order a new trial on the authority of Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Whether publicity is so prejudicial that it forecloses the possibility of a fair trial is a determination which is well-suited for the trial judge since he has an opportunity to observe the impact of publicity on the jurors. Consequently, he should have wide discretion to assess such matters and his view should be determinative unless that discretion be abused. See, e. g., United States v. Bentvena, 319 F.2d 916, 934 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Feldman, 299 F.2d 914, 917 (2d Cir.), cert. denied, 370 U.S. 910, 82 S.Ct. 1256, 8 L.Ed.2d 403 (1962); cf. United States v. Moran, 236 F.2d 361 (2d Cir.), cert. denied, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118 (1956). "Generalizations beyond that statement are not profitable, because each case must turn on its special facts." Marshall v. United States, supra, 360 U.S. at 312, 79 S.Ct. at 1173. Here, although the bulk of the publicity that occurred in the New York City press on February 17th was prejudicial in that it could not properly have been admitted in evidence, it cannot be characterized as outrageously inflammatory.[8] Compare Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Moreover, the situation here is in no way comparable to that in Marshall v. United States, supra, where the Court reversed a conviction for unlawfully dispensing drugs where it was shown that seven jurors had been exposed to news articles which disclosed the defendant's prior criminal record and other information after the same material had been excluded from the trial by the trial judge. By direct contrast, the adverse publicity in the present case appeared several months prior to the trial and the importance of this time-lag cannot be overlooked. Both the Supreme Court and this court have indicated that the length of time between the publication of adverse publicity and the empaneling of the jury is a significant factor in assessing claims of prejudice resulting from pre-trial publicity. See Beck v. Washington, 369 U.S. 541, 556–558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1961); Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (six weeks); United States ex rel. Brown v. Smith, 306 F.2d 596, 603 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963) (three months). Since the articles involved here were twelve weeks old at the time the jury was empanelled, it is highly unlikely that they were retained in the memories of the jurors. As Judge Weinfeld has pointed out, it is a fact that "frequently in this large metropolitan district prospective jurors show little recall of past widely publicized matters * * *." United States v. Kahaner, 204 F.Supp. 921, 924 (S.D.N.Y.1962). The soundness of this observation is well-illustrated by the present case, for not one prospective juror who underwent the thorough voir dire conducted by the trial court indi-

---

8. In fact, certain testimony showing Collier's associations with Cuba and linking all of the appellants to the Black Liberation Front was properly admitted in evidence at trial. See text part II(A) (4).

Moreover, Collier made no objection to that testimony at trial, and Bowe and Sayyed did not object to the testimony concerning the Black Liberation Front.

cated that he could not render an impartial verdict. Under the circumstances, "[w]e cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law." Beck v. Washington, supra, 369 U.S. at 557, 82 S.Ct. at 964.[9]

■ Appellants' final contention is that the trial judge erred as a matter of law in failing to examine the prospective jurors individually concerning the impact of pre-trial publicity on their views of the case. This argument is clearly inconsistent with the rule that a trial judge has wide discretion in dealing with pre-trial publicity, and the statement in Marshall v. United States, supra, that each case must rest on its "own special facts." Moreover, it fails to take account of the thorough and extensive voir dire conducted by the trial court and to recognize that each juror who rendered a verdict in this case was asked individually whether he knew of any reason why he could not serve fairly on the jury and answered no.

Moreover, appellants' reliance on United States v. Accardo, 298 F.2d 133 (7th Cir. 1962), and Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), cert. denied, 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961), in which convictions were reversed due to the exposure of jurors to prejudicial information during the trials is misplaced. The statements in those cases to the effect that the trial judge should have asked each juror personally what effect the prejudicial information had on his view of the case have no bearing on a determination of the propriety of the voir dire

conducted here, where the only publicity alleged to be prejudicial was published twelve weeks prior to trial. As the court indicated in *Accardo,* the fact that jurors exposed to publicity during a trial would probably be very reluctant to confess violating a trial court's admonition to refrain from consulting any materials dealing with the trial not introduced in evidence in front of their fellow jurors militates in favor of examining such jurors individually and out of the presence of other jurors. On the other hand, no such stigma is attached to an admission by a prospective juror that he has read or heard about a pending matter. Although it is no doubt true that the risk of exposure to pre-trial publicity may be greater due to the absence of any admonition by a trial judge, that has no bearing on the willingness of prospective jurors to disclose their exposure to such material. In any event, the comments in *Coppedge* and *Accardo* concerning the conduct of voir dires during trial at best have the force of dictum even when viewed in their proper context, for, in each case, the court, relying on Marshall v. United States, supra, held that prejudice existed as a matter of law, i. e., that "it would have been impossible to have cured in the mind of any reasonable juror the damage done to the cause of * * * [the defendant] by the statements in the newspaper articles." Coppedge v. United States, supra, 272 F.2d at 508; see United States v. Accardo, supra, 298 F.2d at 136. To conclude, the thorough voir dire conducted by the trial court, coupled with the substantial lapse of time between the empanelling of the jury and the publication of the prejudicial information, adequately insured a fair and impartial trial.

■ (E) *Denial of Collier's discovery motions:* Collier objects to the denial of certain discovery motions, to wit, a

9. It cannot be gainsaid that the adverse publicity originally appeared in a government news release, for, not only was similar information revealed to the press at a public bail hearing the day the release was issued, cf. Stroble v. State of California, 343 U.S. 181, 193–195, 72 S.Ct. 599, 96 L.Ed. 872 (1952), but

Government participation in the release "cannot compensate for the complete absence of a showing of prejudice." United States v. Bletterman, 279 F.2d 320, 322–323 (2d Cir. 1960). See also United States v. Rosenberg, 200 F.2d 666, 670 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384 (1953).

motion to view the relevant scenes of the crime, particularly the scene of his arrest; a motion for the issuance of a subpoena to the Police Commissioner of the City of New York directing him to provide Collier with copies of all press releases concerning the case; and a motion for an independent chemical analysis of dynamite in the Government's possession. In addition, he objects to the denial of certain particulars set forth in his motion for a bill of particulars. The record indicates that the trial court correctly dealt with these matters and they warrant no further discussion.

▮ Collier also objects to the denial of two motions requesting the trial court to pay for a trip by his privately retained counsel to Canada to conduct an investigation and interview certain witnesses. He points out that the Government sent investigators to Canada, and argues that the right to counsel cannot be fully protected unless a poor defendant's investigatory powers are co-extensive with those of the Government. Aside from the fact that, at the present time, there is no provision of law which authorizes the federal courts to reimburse privately retained attorneys of indigent defendants for expenses incurred in conducting litigation [18 U.S.C. § 3006A(d) provides that assigned counsel "shall be reimbursed for expenses reasonably incurred"], Collier has failed to show that the trial court's action deprived him of the effective assistance of counsel and, thus, the denial of the motion cannot be considered reversible error.

II. *Trial:*

(A) *Error Alleged in Receipt of Government's Evidence:*

(1) *Materials taken from Collier's home:*

▮ On February 16 and 17, 1965, the Government, pursuant to search warrants issued by a Justice of the Supreme Court of the State of New York, took certain items from Collier's home which consisted, among other things, of planks of wood, long spike nails, bottles, cotton wadding, a funnel and two plastic containers of gasoline and benzine. Although Collier contends that the seizure was illegal, the record shows that the issuance of the warrants clearly met the standards articulated in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), and, thus, was proper. Collier also argues that the materials should have been excluded from the trial as irrelevant; but when they were offered in evidence, he objected only to their receipt without a voir dire, not on grounds of relevancy. Moreover, testimony concerning them was received without objection and showed that most of the materials were supplies that Collier had asked Wood to collect and bring to his apartment on January 19th, the date of the initial meeting among Wood, Bowe, Sayyed and Collier, and which were to be used to manufacture crude weapons and for instruction in the art of violence. Although these materials were not intended for use on the Statue of Liberty, it cannot be said that they were irrelevant to the conspiracy. The trial judge correctly admitted them.

(2) *Sayyed's rifles and testimony concerning them:*

▮ The Government introduced into evidence two M-1 carbines and several clips of thirty-calibre ammunition which were taken from Sayyed at the time of his arrest. Collier's claim that they were improperly received [10] is without merit, for he was fully protected by the trial court's instruction that such evi-

---

10. Collier also contends that the seizure of Sayyed's and Bowe's guns was illegal, although neither of them made such a claim. This contention is frivolous, for Collier has failed to claim, and there is no evidence to show, that he owned, possessed or had any interest in the seized property. See United States v. Cooperstein, 221 F.Supp. 522, 524 (D.Mass.1963) (Wyzanski, J.); cf. Jones v. United States, 362 U.S. 257, 265, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Moreover, the record indicates that the seizure was lawful.

dence was received only with respect to Sayyed.

Sayyed contends that the rifles should have been excluded as irrelevant and as highly prejudicial. The Government argues, however, that since Sayyed on direct examination placed his character in issue and attempted to portray himself as opposed to all forms of violence, it was proper on cross-examination to question him concerning the guns and introduce them, for the purpose of rebutting, i. e., contradicting, his self-portrait. Sayyed repeatedly testified that he was associated with non-action groups participating in the civil-rights movement and stated that, in the meetings with Bowe, Wood and Collier, he had vigorously opposed any violent action. Moreover, toward the end of his direct examination, he testified that he had a hunting license and owned an M-1 carbine. On cross-examination, the Government brought out that Sayyed, at the time of his arrest at his place of employment in Brooklyn, was carrying not one, but two, carbines and numerous rounds of ammunition. No objection was made to this testimony. Under the circumstances, the evidence was properly admitted for impeachment purposes both to contradict evidence of character, see 1 Wigmore, Evidence § 58 (1940 rev. ed.) and to impeach Sayyed's veracity as a witness. See McCormick, Evidence, § 47 (1954).

(3) *Testimony concerning Bowe's rifles:*

The Government on Bowe's cross-examination brought out that he owned two rifles, and both Collier and Bowe allege error in receipt of the testimony on the ground of relevancy. Collier's allegation of error is without merit for he made no objection at trial. Moreover, the evidence was properly admitted as to Bowe for purposes of contradicting his character evidence, i. e., he sought to establish his character for peacefulness and nonviolence, testifying that he was a peaceful social worker and had been appalled at Wood's suggestions of violence. Moreover, the trial judge has wide discretion in controlling the scope of cross-examination and there is no evidence that he abused it here.

(4) *Other testimony:*

Bowe and Sayyed allege error in the receipt of testimony concerning Cuba and Che Guevara, the Black Liberation Front and Canadian Separatist organizations. Although they concede that the testimony of Wood and Michelle Duclos concerning Collier's trips to Cuba and his association with Che Guevara was relevant as to Collier, they argue that it should have been excluded because it was highly prejudicial. This claim is frivolous. The testimony was offered and received solely against Collier who did not object to its receipt. Bowe and Sayyed were adequately protected by the trial court's oft-repeated instruction to the jury that the evidence could not be considered with respect to either of them. United States v. Dardi, 330 F.2d 316, 333–334 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964).

The allegations of error with respect to testimony concerning the Black Liberation Front and the Canadian Separatist organizations must be rejected for no objection was raised before the trial court and, in any event, it was clearly relevant to the conspiracy.

(B) *Exclusion of Teahan testimony:*

Appellants assign as error the trial court's refusal to permit Joseph Teahan, an eighteen-year old member of the Congress of Racial Equality, to testify that, in July, 1964 at a civil rights demonstration at Foley Square, Wood asked him to participate in a plan to blow up the Statue of Liberty. Three grounds of admissibility are advanced by the appellants.

We reject out of hand the claim that the testimony was admissible for the purpose of impeaching the testimony of Wood, the chief prosecution witness, by showing acts of misconduct not the subject of a prior criminal conviction.

Character impeachment by proof of misconduct not the subject of convictions is not only limited to cross-examination, see United States v. Masino, 275 F.2d 129, 133 (2d Cir. 1960); McCormick, supra § 49, at 89 & n. 21, but, in this circuit, "specific acts of misconduct not resulting in conviction of a felony or crime of moral turpitude are not the proper subject of cross-examination for impeachment purposes." United States v. Provoo, 215 F.2d 531, 536 (2d Cir. 1954); see United States v. Murray, 297 F.2d 812, 817 n. 1a (2d Cir.), cert. denied, 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962). Furthermore, the doctrine of impeachment by contradiction is inapposite since Wood never was requested to, or did, testify concerning conversations with Teahan in July, 1964 and, thus, none of his testimony could be considered either consistent or inconsistent with the proffered testimony. See McCormick, supra §§ 34, 37; Robinson v. United States, 144 F.2d 392, 405 (6th Cir. 1944). In other words, appellants failed to lay a proper foundation to support an attack on Wood's credibility based on his alleged request to Teahan to take part in violent action.

Appellant's strongest argument is that Teahan's testimony was relevant to the defense of entrapment on the theory that it tended to show a custom on Wood's part to urge persons to engage in acts of violence against government property which would justify an inference that he made similar suggestions to appellants or, simply, that it showed his intention to induce appellants to engage in unlawful activity. There is little doubt that the testimony was relevant to the defense of entrapment. While it is true that once a reasonable possibility of encouragement by a law officer is established [the Government concedes this here], the only material issue concerns the effect of the encouragement on a defendant; the nature and degree of the encouragement bear directly on a determination of whether the law officer caused a defendant to commit a crime which he would otherwise not have been disposed to commit. Thus, the issue here is whether the exclusion of the admittedly relevant evidence constituted an abuse of discretion by the trial judge. We conclude that it did not.

A trial judge has discretion to exclude evidence which is only slightly probative if its introduction would confuse and mislead the jury by focusing its attention on collateral issues and if it would unnecessarily delay the trial. McCormick, supra § 152, at 319–20; 2 Wigmore, supra §§ 443, 444; see United States v. Costello, 221 F.2d 668, 674 (2d Cir. 1955) (L. Hand, J.), aff'd, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); United States v. Grayson, 166 F.2d 863, 867 (2d Cir. 1948). See also F.R. Crim.P. 26. The rationale underlying this broad grant of discretion is that such a determination necessarily requires the balancing of intangible factors peculiarly within the knowledge of the trial judge. McCormick, supra, § 152. Here, Teahan's testimony was only slightly probative with respect to the extent of Wood's encouragement of the appellants since, at the time it was offered, there was substantial evidence in the record showing that Wood had encouraged and attempted to influence appellants in adopting a plan to destroy government property. Not only did Bowe and Sayyed testify that Wood had initially suggested the specific scheme to blow up the Statue of Liberty, and other acts of violence, but Wood himself testified (a) that he had often spoken favorably of the Statue of Liberty plot to appellants; (b) that he had argued in favor of the plan when Sayyed had expressed reservations about it, and (c) that he had provided a car for the trip to Canada with Collier to obtain the explosives. Thus, Teahan's testimony was only cumulative as to whether Wood had encouraged appellants to act and had some bearing, but not much, on whether Wood had been the creative force behind the scheme, i. e., whether appellants were unwary innocents or unwary criminals. See Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

On the other hand, it is apparent, as the trial judge stated after hearing extensive argument, that the introduction of the proffered testimony would have opened up a trial within a trial. It would not only have been proper to call witnesses to the alleged conversation in July, 1964 between Teahan and Wood, for purposes of clarifying whether, by whom and in what context the statements were made but other witnesses might have been called for impeachment purposes. See 3 Wigmore, supra § 950; McCormick, supra § 40. The trial judge correctly concluded that the confusion and delay which would have resulted from the introduction of Tehan's testimony outweighed its slight probative value. Finally, it cannot be gainsaid that the evidence was offered to show habit, for such evidence can be excluded where, as here, it is cumulative, see, e. g., Levin v. United States, 338 F.2d 265 (D.C.Cir. 1964), cert. denied, 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965), or only slightly probative. McCormick, supra § 162, at 342.

Appellants also object to the trial court's refusal to permit Barbara Loeb to testify that in June, 1964 she saw Wood at a civil rights rally and suggested blowing up the Statue of Liberty to him, and that he inquired as to what effect that would have. The grounds for excluding Teahan's testimony are more than sufficient to justify the action of the trial court with respect to Loeb's testimony.

(C) *Miscellaneous points:*

 Collier's contentions that he was denied a public trial on the ground that the trial court heard various motions and made inquiries out of the presence of the jury and that he was denied due process by alleged displays of racial animosity on the part of the trial judge have been considered and are rejected. As for the 18 U.S.C. § 3500 claim, the record discloses that the Government fully complied with the requirements of that section.

Affirmed.