Cook v. SSA                                CV-03-271-M    01/23/04

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Warren B. Cook,
      Claimant

      v.                                  Civil No. 03-271-M
                                          Opinion No. 2004 DNH 022
Jo Ann B. Barnhart,
Commissioner, Social
Security Administration,
      Respondent


**O R D E R**


Pursuant to 42 U.S.C. § 405(g), Warren B. Cook moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The Commissioner, in turn, moves for an order affirming her decision. For the reasons given below, the matter is remanded to the Administrative Law Judge ("ALJ") for further proceedings consistent with this opinion.


**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st

2

Cir. 1980) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." <u>Irlanda Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting <u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).[1]

## Background

The parties have submitted a Joint Statement of Material Facts (document no. 7), which is part of the court's record. Accordingly, this section is limited to a brief survey of the key facts.

According to claimant, he became disabled on July 2, 1999, due to ulnar nerve damage and back and leg pain. He had "insured

---

[1] "It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (citations omitted). Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529, 535 (1st Cir. 1988).

status" for disability insurance benefits through December 31, 2000.

Back and Leg Pain

In September 1996, claimant had disc surgery, as a result of a workplace injury. In October 1999, he aggravated his back while lifting an air conditioner, and was diagnosed with sciatica.

In May 2000, claimant saw Dr. Mark Aronson, complaining of back pain that resulted from driving a rental car. A September 2000 lumbar MRI showed disc degeneration and some bulging without sign of herniation at L2-3 and L4-5 (with borderline stenosis at the latter level), and post-surgical changes at L3-4 (without recurrent herniation but with mild residual degenerative narrowing). In October 2000, claimant was diagnosed with severe lumbar tenderness and spasm. The following month, he was diagnosed with degenerative lumbar disc disease at the L3-4 level, with a prescription for a back brace and physical therapy.

In March 2001, claimant reported low back pain radiating into his upper right leg, and Dr. Seddon R. Savage recommended that he enroll in a pain group, in addition to continuing with physical therapy and use of a back brace and a TENS unit. In May 2001, claimant reported some improvement in his back. The following month, he complained of continuing low back pain, made tolerable by Percocet. Finally, in April 2002, claimant reported weakness in his right leg, ongoing low back pain radiating into his right leg, and headaches related to muscle spasm apparently related to his lower back condition.

Ulnar Nerve Damage

In March 1999, claimant injured his left arm at work, and was diagnosed with medial epicondylitis. After using splints and undergoing physical therapy, claimant had surgery on his left elbow,[2] in July 1999, followed by physical therapy. In December 1999 further surgery was recommended, and in January 2000, claimant had a second elbow operation.[3] He followed up with

---

[2] Claimant's July 21, 1999, "release of flexor origin, left elbow" was performed by Dr. William Mitchell. (Tr. at 331.)

[3] Claimant's January 5, 2000, "transposition subcutaneous ulnar nerve, left elbow" was also performed by Dr. Mitchell. (Tr. at 333.)

5

physical therapy.  In May 2001, claimant reported ongoing problems with his left arm, and the following month, he reported pain and numbness.

Medical Opinions

Claimant's capacity for work has been predicted and evaluated on many occasions, in a variety of contexts.

On May 12, 1999, Dr. Mitchell saw claimant on a workers' compensation referral occasioned by his work-related elbow injury, and indicated that claimant could return to work so long as he did no work involving use of his left arm.  (Administrative Transcript ("Tr.") at 326.)  On June 30 of that same year, claimant was examined by Dr. Lawrence Luppi of Concentra Medical Examinations who stated: "Mr. Cook will demonstrate a total disability of two to six weeks and a partial disability following this of two to six weeks.  The prognosis of return to full employment is good."  (Tr. at 357.)  In an initial evaluation dated September 2, 1999, Gilbert Lawrence of Laconia Physical Therapy indicated the following functional limitations: "Reaching, lifting, grasping, work duties, driving, sleeping, grooming, dressing and recreational activities."  (Tr. at 361.)

6

On March 7, 2000, Lawrence noted the following functional limitations: "Grasping, lifting, reaching, house and yard work, recreational activities and work duties."  (Tr. at 367.)

On December 2, 1999, Dr. Mordecai Berkowitz evaluated claimant prior to his second elbow operation, and predicted that "he might be capable of resuming light work approximately eight weeks after surgery."  (Tr. at 375.)  Based upon a March 30, 2000, examination and re-evaluation, Dr. Berkowitz reached the following conclusions:

> At the time of this evaluation, this examinee does have mild objective findings.  However, I do believe that Mr. Cook is capable of working full time in a modified capacity, with lifting up to 5 pounds frequently and 25 pounds on occasion.  I do not believe he should be required to twist heavy wrenches at this time.
>
> I  believe the therapy he is receiving is appropriate for an additional two to three weeks, and at the end of approximately an additional three to four weeks I believe Mr. Cook should be capable of resuming his regular job as a pipe fitter.

(Tr. at 377.)

On July 25, 2000, Dr. Mitchell examined claimant, and on October 3, 2000, he wrote:

7

Despite conservative measures including supervised physical therapy to recondition his arm, the patient continues to be disabled with active use of his left elbow. It is quite apparent that the patient's ability to work would be that in a modified capacity, limiting any use of his left arm including repetitive power, grip and grasp maneuvers to less than five pounds. He should not be in the position to perform any task requiring power, grip and grasp of his left arm. The patient would be able to resume work with the above restrictions pending an evaluation by a hand surgeon to determine the etiology of his persisting painful symptoms.

(Tr. at 349.) On December 5, 2000, Dr. Mitchell wrote:

EMG/NCS show a chronic ulnar neuropathy, signs and symptoms consistent with a permanent deficit in function of his left hand. He is limited in his ability to tolerate power, grip, grasp and fine finger dextrous coordinated maneuvers. . . . Based on his current complaints and the EMG/NCS, the patient is a candidate for modified duty, including no heavy workloads are recommended. Light to moderate work capacity, perhaps a functional capacity evaluation would be appropriate at this time.

(Tr. at 350.) It appears that no functional capacity evaluation was performed at that time.

On April 25, 2001, on some sort of insurance company form, Dr. Savage reported seeing claimant once, for a consultation, which he provided without the benefit of any longitudinal

8

information.  (Tr. at 380.)  Based upon that consultation, Dr.
Savage stated that claimant had been totally disabled from July
1999 through the date of consultation, would be released to work
in his regular occupation at some indefinite point, and was
subject to the following work restrictions: "avoid heaving,
lifting, bending, twisting, extending."  (Tr. at 380.)

On May 5, 2001, Dr. Hugh Fairley, a state agency medical
consultant, conducted a Residual Functional Capacity ("RFC")
Assessment.  Regarding exertional limitations, Dr. Fairley found
that claimant could: occasionally lift and/or carry twenty
pounds, frequently lift and/or carry ten pounds, stand and/or
walk for about six hours in an eight-hour workday, sit for about
six hours in an eight-hour workday, and push/pull without
limitation.  (Tr. at 383.)  Regarding postural limitations, Dr.
Fairley found that claimant could occasionally climb, balance,
stoop, kneel, crouch, and crawl.  (Tr. at 384.)  Dr. Fairley
found no visual, communicative, or environmental limitations, and
only one manipulative limitation, a limited ability for handling,
which he explained more fully in the narrative section of his
assessment.  (Tr. at 385.)  In his narrative, Dr. Fairley stated:

9

In summary, the claimant is credible. The diagnoses are status-post lumbar discectomy with chronic low back pain and radicular symptoms still occurring. Left ulnar neuropathy, status-post transposition of the left ulnar nerve, with ongoing symptoms.

It is recommended that the claimant be reduced to lifting no more than 20 pounds occasionally, no more than 10 pounds frequently. He should avoid work requiring frequent bending, stooping, climbing, kneeling and he should avoid work that requires frequent left-handed tight grasping.

(Tr. at 389.)

On October 24, 2001, Dr. John Sharpe examined claimant. In a letter dated November 2, he stated, in pertinent part:

It appears that Mr. Cook is clearly not able to resume his prior activities doing heavy labor; this opinion was also reflected in orthopedic and pain management notes.

It is not clear to me that Mr. Cook is disabled from less demanding activities at this time. At the time of his orthopedic evaluation in May 2001 it was noted that vocational rehabilitation was to be sought; the results of that evaluation are not known to me.

Certainly such an evaluation should be obtained if it has not yet been completed.

I do not feel that I am able to make any long-term estimate of his further treatment or prognosis, given that I have had limited interaction with Mr. Cook at this time. I note that he was felt by orthopedics to be improving when last seen in May 2001; a follow up exam in one year was suggested.

10

(Tr. at 393.)

Finally, on May 21, 2002, in conjunction with an annual follow-up examination, Dr. Richard Corzatt gave a "Medical Source Statement of Ability to do Work-Related Activities" (Tr. at 401-04), in which he found that claimant could: occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for at least two hours in an eight-hour work day, sit for about six hours in an eight-hour workday, and push/pull no more than twenty-five pounds with his lower extremities. Dr. Corzatt also found that claimant was limited to occasional climbing, balancing, kneeling, crouching, crawling, and stooping; occasional reaching; and had environmental limitations regarding humidity/wetness and hazards.

Based upon the foregoing, the ALJ made the following findings:

3. The medical evidence establishes that the claimant has a left ulnar nerve disorder, status post surgery and is status post L3-4 discectomy with low back pain and radiculopathy. These impairments are accompanied by pain which interfere[s] with his ability to do basic work

11

activities. Therefore, the claimant has a "severe" impairment.

. . .

5.  Prior to December 31, 2000, the claimant ha[d] pain and functional limitations resulting from the pain. However, his complaints of pain and alleged functional limitations were not as severe as alleged and were only partially credible.

6.  Prior to December 31, 2000, the claimant had the residual functional capacity to lift and carry up to 20 pounds occasionally and 10 pounds frequently. He was advised to avoid work that required frequent bending, stooping, climbing, kneeling and work that required frequent left-handed grasping.

. . .

8.  Prior to December 31, 2000, the claimant had the residual functional capacity to perform light and sedentary work, but not the full range of light work.

. . .

11. The claimant does not have skills that are transferable to light occupations (20 CFR 404.1568).

12. If the claimant had the residual functional capacity to perform the full range of light work and considering his vocational profile, Rule 202.21 of Table No. 2, Appendix 2, Subpart P, Regulations Part 404 would direct a conclusion of "not disabled."

13. Although the claimant's nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rule as a framework for decision making, there remain a

12

> significant number of jobs in the national economy
> that he could perform.  Examples of occupations in
> which such jobs exist are: construction inspector
> (296 jobs regionally and 50,000 jobs nationally),
> cost estimator (15 jobs regionally at the
> sedentary level and 368 jobs regionally at the
> light level and at the light level, 59,000 jobs
> nationally), escort vehicle driver (54 jobs
> regionally and 4,100 nationally), fast foo[d]
> worker (2,100 jobs regionally and 403,000 jobs
> nationally) and messenger (674 jobs regionally and
> 32,000 jobs nationally).

(Tr. at 19-20.)

In the narrative section of his decision, the ALJ stated that "[a] recent assessment from the treating source [presumably Dr. Corzatt] allows for work in the light to sedentary range." (Tr. at 17.)  He then characterized claimant's residual functional capacity in the following way:

> The undersigned finds that, prior to December 31, 2000,
> the claimant was able to sit, stand or walk for up to 6
> hours in an 8-hour workday.  He had the ability to
> occasionally lift and carry up to 20 pounds and
> frequently lift and carry objects weighing up to 10
> pounds.  He should avoid tasks that require frequent
> bending, stooping, climbing, kneeling and frequent
> left-handed grasping.

> In reaching this conclusion, the undersigned adopts the
> medical opinion of the State agency medical consultant
> regarding the claimant's abilities to do work related
> activities.  The undersigned finds that this opinion is
> well supported by medically acceptable clinical and

13

> laboratory diagnostic techniques <u>and is not</u>
> <u>inconsistent with the other substantial evidence in the</u>
> <u>record.  Most importantly, this conclusion finds</u>
> <u>support in the assessments and opinions of the</u>
> <u>examining and treating physicians in this record, Drs.</u>
> <u>Berkowitz, Mitchell and Corzatt</u>.

(Tr. at 16-17 (emphasis added).)

## Discussion

According to claimant, the ALJ's decision should be reversed because the ALJ: (1) incorrectly determined his RFC; (2) failed to properly analyze his subjective complaints of disabling pain; (3) failed to pose a proper hypothetical question to the vocational expert ("VE"); and (4) made an improper credibility determination.  The Commissioner disagrees categorically.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question in this case is whether the ALJ correctly determined that claimant was not under a disability prior to December 31, 2000, the last date on which he had insured status.

14

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled for the purpose of determining eligibility for disability insurance

15

benefits, an ALJ is required to employ a five-step process.  <u>See</u>

20 U.S.C. §§ 404.1520.

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform past
> relevant work, then the application is denied; 5) if
> the [claimant], given his or her residual functional
> capacity, education, work experience, and age, is
> unable to do any other work, the application is
> granted.

<u>Seavey v. Barnhard</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 1520).

The claimant bears the burden of proving that he is

disabled.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  <u>See</u> <u>Mandziej v.</u>

<u>Chater</u>, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing <u>Paone v.</u>

<u>Schweiker</u>, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  However,

> [o]nce the [claimant] has met his or her burden at Step
> 4 to show that he or she is unable to do past work due

16

to the significant limitation, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the [claimant] can still perform. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). If the [claimant's] limitations are exclusively exertional, then the Commissioner can meet her burden through the use of a chart contained in the Social Security regulations. 20 C.F.R. § 416.969; Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, App. 2, tables 1-3 (2001), cited in 20 C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458 (1983). "The Grid," as it is known, consists of a matrix of the [claimant's] exertional capacity, age, education, and work experience. If the facts of the [claimant's] situation fit within the Grid's categories, the Grid "directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited in 20 C.F.R. § 416.969. However, if the claimant has nonexertional limitations (such as mental, sensory, or skin impairments, or environmental restrictions such as an inability to tolerate dust, id. § 200(e)) that restrict his [or her] ability to perform jobs he [or she] would otherwise be capable of performing, then the Grid is only a "framework to guide [the] decision," 20 C.F.R. § 416.969a(d) (2001). See also Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (discussing use of Grid when applicant has nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted). Finally,

In assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience.

17

<u>Mandziej</u>, 944 F. Supp. at 129 (citing <u>Avery v. Sec'y of HHS</u>, 797 F.2d 19, 23 (1st Cir. 1986); <u>Goodermote v. Sec'y of HHS</u>, 690 F.2d 5, 6 (1st Cir. 1982)).

Here, the ALJ's determination that claimant had the capacity for light work rests upon both factual and legal errors. Factually, the ALJ overlooked a material inconsistency between two medical opinions. Because of that error, the ALJ failed to weigh those conflicting opinions and explain his decision to credit one over the other.

In the narrative portion of his decision, the ALJ adopted Dr. Fairley's RFC assessment and concluded that claimant had the capacity to "stand or walk for up to 6 hours in a normal 8-hour workday." (Tr. at 17.) He went on to state that his conclusion was "not inconsistent with the other substantial evidence in the record" and that it was supported, inter alia, by the assessment of Dr. Corzatt. Those statements are both factually incorrect.

Unlike Dr. Fairley, who found claimant able to stand and/or walk for six hours in an eight-hour workday, Dr. Corzatt found that claimant was capable of standing and/or walking "at least 2

18

hours in an 8-hour workday." In other words, Dr. Fairley's RFC assessment _was_ inconsistent with Dr. Corzatt's statement of ability to do work-related activities. That inconsistency is material because "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1993 WL 31251, at *6; see also 20 C.F.R. § 404.1567(b); Heggarty v. Sullivan, 947 F.2d 990, 994 (1st Cir. 1991). Not only was it incorrect for the ALJ to find that Dr. Fairley's RFC assessment was not inconsistent with the other substantial evidence in the record, it was also incorrect to state that Dr. Corzatt's assessment "allow[ed] for work in the light to sedentary range." (Tr. at 17.) Because Dr. Corzatt found claimant unable to stand and/or walk for about six hours in an eight-hour workday, his assessment does not support a finding that claimant was capable of light work.

Because the ALJ did not recognize the inconsistency between the evaluations of Drs. Fairley and Corzatt, he did not weigh those two opinions against one another, as required by 20 C.F.R. §§ 404.1527(c)(2) and (d), and, necessarily, he did not give good reasons for discounting the opinion of Dr. Corzatt, who was a treating source. See § 404.1527(d)(2) ("We will always give good

19

reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Accordingly, it is not possible to affirm the ALJ's decision that claimant has the residual functional capacity for light work. While there may be acceptable reasons for discounting the treating source opinion in this case, it is up to the ALJ, in the first instance – or on remand – to develop those reasons.

Because the ALJ's determination that claimant was capable of light work cannot be affirmed, his decision may only be affirmed if substantial evidence supports his determination that claimant had the residual functional capacity to perform the two sedentary occupations identified by the VE - cost estimator (a skilled job) and escort-vehicle driver (an unskilled job). Based upon the ALJ's determination that claimant had no transferrable job skills (Tr. at 18), and claimant's testimony that he did not have any knowledge of the costs involved in sprinkler system installation (Tr. at 57), substantial evidence does not support the ALJ's determination that claimant had the residual functional capacity to work as a cost estimator. That leaves escort-vehicle driver.

20

According to claimant, he was unable to work as an escort-vehicle driver because: (1) that occupation requires frequent reaching and frequent handling; (2) Dr. Corzatt found him capable of only occasional reaching; and (3) Dr. Fairley found him limited in his ability for handling. The ALJ erred, in claimant's view, by failing to ask the VE whether his testimony conflicted with the Dictionary of Occupational Titles ("DOT"), and by relying upon the VE's implicit testimony that the escort-vehicle driver occupation did not require frequent handling (or reaching). The Commissioner counters that the ALJ did not determine that claimant had a generic bilateral limitation in his ability for handling but, rather, that claimant was unable to perform only "frequent left-handed grasping" - a subset of the full range of "handling." In other words, the Commissioner says that the ALJ, in adopting Dr. Fairley's RFC assessment, did not determine that claimant was only capable of occasional handling. The Commissioner further points out that the VE was aware of claimant's precise limitation when he gave his testimony.

Claimant is correct in his assertion that the ALJ failed to ask the VE whether his testimony about the requirements of various occupations was consistent with the DOT, as required by

21

SSA 00-4p, 2000 WL 1898704, at *4. What is less clear, however, is whether the VE actually – if implicitly – characterized the escort-vehicle driver occupation differently than it is characterized in the DOT. Claimant correctly states that the DOT lists frequent reaching and frequent handling as physical demands of the escort-vehicle driver occupation. The VE, however, did not offer direct testimony to the contrary. Rather, he merely stated that, based upon the RFC posited by the ALJ (which was based upon the RFC found by Dr. Fairley), claimant was capable of working as an escort-vehicle driver. If the VE understood Dr. Fairley's RFC assessment to limit claimant to only occasional handling, then he must, implicitly, have concluded that escort-vehicle driving requires occasional rather than frequent handling, which would be a conclusion in conflict with the DOT. If, on the other hand, the VE understood Dr. Fairley's RFC assessment to include a more narrow limitation that pertained only to the left arm and to a certain type of handling, then he did not necessarily conclude that escort-vehicle driving could be done by a person capable of only occasional handling. Moreover, it is by no means a logical impossibility that someone with the handling limitation indicated by Dr. Fairley could meet the physical demands of some occupations requiring frequent handling,

22

depending on the nature of the handling involved in the specific occupation. Of course, had the pertinent question been asked, there would be no need to speculate about the VE's understanding of the physical demands of escort-vehicle driving. That shortcoming can be rectified on remand.

Claimant has raised several other objections to the ALJ's decision, but because the entire matter is remanded on the grounds outlined above, it is not necessary to address claimant's remaining arguments.

### Conclusion

For the reasons given above, claimant's motion to reverse (document no. 4) is granted to the extent that this matter is remanded to the ALJ for further consideration. The Commissioner's motion for an order affirming her decision (document no. 6) is necessarily denied.

Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is remanded to the ALJ for further proceedings. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

23

**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

January 23, 2004

cc:  David L. Broderick, Esq.
     Karen B. Nesbitt, Esq.